Philip C. MILLER, Plaintiff-Appellant,

v.

GATEWAY TRANSPORTATION COM-
PANY, INC., a corporation,
Defendant-Appellee.

No. 79–1259.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 22, 1979.

Decided Feb. 7, 1980.

Rehearing Denied April 29, 1980.

Howard M. Goldrich, Chicago, Ill., for plaintiff-appellant.

Arnold L. Burke, Chicago, Ill., for defendant-appellee.

Before PELL, Circuit Judge, VAN DUSEN, Senior Circuit Judge,* and TONE, Circuit Judge.

TONE, Circuit Judge.

This appeal presents the question of whether the plaintiff is entitled to a trial on his claim that the defendant company violated his rights under a collective bargaining agreement by first suspending him for eight days and later discharging him. We conclude that triable issues are present, reverse a summary judgment for the company, and remand for trial.

Plaintiff Philip Miller brought this action under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), alleging that his former employer, defendant Gateway Transportation Co., Inc., had wrongfully suspended him and later terminated his employment, and that his union, Local Union No. 710 of the International Brotherhood of Teamsters, had failed in its statutory duty of fair representation in prosecuting Miller's grievances challenging Gateway's actions. The district court granted summary judgment in favor of Gateway and Local Union 710 on the ground that Miller had failed to exhaust his internal union remedies before bringing suit. Miller's appeal from the grant of summary judgment in favor of Local 710 was dismissed by this court as untimely, leaving

---

* The Honorable Francis L. Van Dusen, Senior Circuit Judge of the United States Court of Appeals for the Third Circuit, is sitting by designation.

before us only the instant appeal from the summary judgment in favor of Gateway.

*The Facts*

In late 1974, Miller was hired as a truck driver by Gateway, whose employees were represented by Local 710. Miller had been a truck driver and member of the Teamsters Union for approximately thirty years and was a member of Local 710 while in Gateway's employ.

Miller's troubles began on June 22, 1976, when he was assigned by a Gateway dispatcher to drive a truck that, he alleges, exceeded the maximum legal height limit of 13 feet 6 inches. The dispatcher measured the truck at Miller's request and concluded it was within the legal limit, but Miller was dissatisfied with the measurement and requested that the dispatcher make a notation to that effect on the manifest. The dispatcher refused, and Miller then made his own measurement, which revealed he testified in his deposition, that the height exceeded the legal limit. Miller then refused to drive the truck.

This incident resulted in disciplinary action against Miller. Gateway at first took the position that he had "voluntarily quit" his job, but later relented at the behest of a union representative and reduced the disciplinary action to suspension for eight days and a written "final warning" that "any future occurrence of this nature will result in disciplinary action and/or discharge." Pursuant to the collective bargaining agreement between the employer and the union, Miller filed a grievance seeking back pay for the time he was placed on suspension.

Another clash between Miller and his employer was not long in coming. On August 16, 1976, a Gateway dispatcher ordered Miller to drive a truck to Cincinnati, Ohio, his bid point, via Louisville, Kentucky. He delayed in accepting the assignment, because, he alleges, he was concerned over the legali-

ty of the amount of time he would need to spend on the road to complete the trip. He consulted a union representative, who advised accepting the assignment. Approximately a quarter of an hour after he had been assigned the trip, Miller called Gateway to say he would take the assignment; he was then told, "As of now, you've resigned." Shortly thereafter, Miller received written notice that his employment had been terminated for refusal to take a normal work assignment. Miller filed a grievance claiming that the discharge was wrongful.

Miller's grievances, one challenging the eight-day suspension and the other the discharge, were consolidated and heard before the Chicago Joint State and Local Committee, a panel composed of three union and three management members. At the hearing, the representative the union furnished for Miller merely read the written grievances Miller had prepared. The committee denied both grievances. According to Miller, he then asked the union representative whether he could appeal the decision and was told, "Your appeal was denied."

Miller thereafter filed charges with the National Labor Relations Board alleging that Gateway and Local 710 had committed unfair labor practices. The Board refused to issue complaints on Miller's charges, and his effort to appeal was unsuccessful. The instant action followed.

## I.

■ The district court held that Miller's failure to pursue certain internal union remedies provided by the International Brotherhood of Teamsters' constitution and by the constitution and by-laws of Local Union 710 precluded him from bringing his § 301 suit against Gateway.[1] We cannot agree. Miller prosecuted his grievances to

---

1. Gateway argues in its brief that the trial court did not base its grant of summary judgment for Gateway on Miller's failure to exhaust internal union remedies, but rather based it on Miller's failure to allege facts sufficient to demonstrate that the union breached its duty of fair representation. Although we think this inter-

pretation of the district court's memorandum of decision is incorrect, it is immaterial which construction is placed on that order because, as we conclude in Part II of this opinion, *infra*, the district court's order is not sustainable on the alternative ground that no breach of the fair representation duty occurred.

a final and binding determination under the terms of the applicable collective bargaining agreement.[2] The remedies the district court held Miller should have exhausted appear not in that agreement, but in the union constitutions and by-laws, to which Gateway was not subject. Assuming that an employer can assert the defense of failure to exhaust internal union remedies,[3] that defense is not available here. The union remedies at issue provide for "trials" of union members, officers, local unions, and other subordinate bodies of the International. Such a trial may be initiated by a union member's complaint alleging a violation of the union constitution or by-laws and may result in "reprimands, fines, suspensions, expulsions, revocations" and other similar relief.[4] That relief does not, of course, include the setting aside of an adverse decision rendered pursuant to the terms of a collective bargaining agreement by a union-employer grievance committee;[5]

neither does it include any other relief to which Miller may be entitled from Gateway.[6] The defense of failure to exhaust internal union remedies is therefore not available to Gateway in this case.

## II.

Gateway urges that the district court's judgment in its favor can be upheld on another ground supported by the record,[7] viz., that Miller's claim under § 301, even if not barred by a failure to exhaust union remedies, is shown by the undisputed facts to be without merit. Gateway argues, correctly, that when, as in this case, the collective bargaining agreement requires exhaustion of a specified grievance procedure before suit can be brought, and that procedure is pursued to a final and binding determination adverse to the employee, he may maintain an action under § 301 to set aside that determination only if he can show both

2. That agreement provided, in relevant part:
 Where a Joint State Committee, by a majority vote, settles a dispute, no appeal may be taken to the Joint Area Committee. Such decision shall be final and binding on both parties.
 Central States Area Over-the-Road Motor Freight Supplemental Agreement Covering Drivers Employed by Private, Common and Contract Carriers, Art. 45, § 1(a) (effective April 1, 1976 through Mar. 31, 1979) [hereinafter cited as Motor Freight Supplemental Agreement].

3. As to this point, on which we do not pass, *see Baldini v. Local 1095, UAW*, 581 F.2d 145, 150 (7th Cir. 1978); *Winter v. Local 639, International Brotherhood of Teamsters*, 186 U.S.App. D.C. 315, 319–320, 569 F.2d 146, 150–51 & n.26 (D.C. Cir. 1977); *Harrison v. Chrysler Corp.*, 558 F.2d 1273, 1278–79 (7th Cir. 1977); *id.* at 1280 (Fairchild, C. J., concurring); *Orphan v. Furnco Construction Corp.*, 466 F.2d 795, 800–01 (7th Cir. 1972).

4. As the District of Columbia Circuit noted in *Winter v. Local 639, International Brotherhood of Teamsters, supra* note 3, 186 U.S.App.D.C. at 320, 569 F.2d at 151, the remedies provided in the Teamsters' constitution are similar to those of the Bricklayers and Stone Masons Union that we previously have held need not be exhausted before bringing a § 301 suit against an employer. *Orphan v. Furnco Construction Corp., supra* note 3, 466 F.2d at 801. The same is true of the remedies provided in Local 710's constitution and by-laws, which consist primar-

ily of an incorporation by reference of the scheme of remedies provided in the Teamsters' constitution.

5. Any suggestion that Miller's pursuit of the internal union remedies might have resulted in a union request that Gateway gratuitously ignore the collective bargaining agreement and reopen the grievance proceedings would strike us as "patently frivolous." *See Harrison v. Chrysler Corp., supra* note 3, 558 F.2d at 1279.

6. Miller seeks monetary damages, reinstatement, and back pay. The union was powerless to offer him reinstatement, whatever internal remedies it made available. Even if those remedies could have resulted in an award of a sum of money to Miller, it is unlikely that such an award would cover damages due from Gateway. Under § 301, "an award against a union [may not] include . . . damages attributable solely to the employer's breach of contract." *Vaca v. Sipes*, 386 U.S. 171, 196–97, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1967).

7. As in other cases, we "may affirm on any ground that finds support in the record," *Mims v. Board of Education*, 523 F.2d 711, 716 n.2 (7th Cir. 1975), in appeals from summary judgments. *See, e. g., United States v. General Motors Corp.*, 518 F.2d 420, 440–41 (D.C. Cir. 1975); 6 *Moore's Federal Practice* ¶ 56.27[1], at 56–1561 (2d ed. 1979); 10 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2716, at 440 (1973).

that the underlying grievance was meritorious and that the union breached its duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). In this case, says Gateway, the undisputed facts show that Miller can prove neither. We think, however, that as to both, the record shows a genuine factual issue, and that this is true in the case of each of Miller's grievances.

Concerning the merit of the grievances, a genuine issue of fact exists as to whether Miller's refusal to accept the June 22, 1976 assignment was justified. The height of the truck Miller was told to drive on that date is clearly in dispute. If Miller is correct that the truck was over the maximum legal height, then he was justified in refusing to drive it,[8] and his suspension was improper.

Whether Miller's June 22 refusal was justified is relevant to the merit of the discharge grievance also. The collective bargaining agreement requires that an employee receive a warning letter before he can be discharged or suspended. This requirement is designed to give the employee a chance to correct a continuing course of misconduct or to avoid repetition of single instances of misconduct; it subjects to suspension or dismissal only the employee who in the face of a warning, engages in further misconduct. The warning letter therefore must be based on some misconduct, and the language of the bargaining agreement, although inartful, indicates as much.[9] Because Miller's conduct on June 22 may have been justified, the warning letter he received as a consequence may have been unwarranted. If this proves to be the case, Miller's discharge as a result of his August 16 refusal to take an assignment lacked the essential predicate of a valid warning letter and therefore contravened the collective bargaining agreement.[10]

Similarly, nothing in the record indicates that Miller had received a valid warning letter prior to the eight-day suspension imposed by Gateway as a consequence of the June 22 refusal. Absent such a warning, Miller's grievance requesting back pay for those eight days would appear to have had merit whatever the height of the load and regardless of the outcome of the discharge issue.

 The second element Miller must prove, a breach by the union of its statutory duty of fair representation, is likewise not foreclosed by the record. The union's duty includes more than merely a "perfunctory" processing of a grievance. *Vaca v. Sipes, supra*, 386 U.S. at 191, 194, 87 S.Ct. at 917, 918; *see Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563, 569, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976). "[A] good faith effort to plead plaintiff's case" is re-

---

8. In oral argument before this court Gateway conceded as much.

9. The employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one warning notice of the complaint against such employee to the employee, in writing . . . .
Motor Freight Supplemental Agreement, *supra* note 2, Art. 46.
Our reading of this provision is strengthened by the absence of a warning letter requirement for the discharge of an employee for certain specific serious offenses. Failure to accept a normal work assignment is not among those offenses. Also, the agreement provides for the expiration of a warning notice nine months from its date of issuance. The inference is inescapable that the warning notice device is intended to create a period of probation during which a single, nonserious instance of misconduct can result in suspension or discharge. Fi-

nally, the agreement also states that an employee may appeal not only discharge or suspension, but also the receipt of a warning notice. The agreement is clear: misconduct is a prerequisite of a valid warning notice, and a valid warning notice is, in turn, required before either discharge or suspension.

10. It does appear that Miller's delay in accepting the August 16 assignment was unjustified. The only argument advanced in support of the delay, other than that it was minimal, is that Miller was concerned that the route selected by Gateway might cause him to drive in excess of the number of hours a driver can legally drive without a rest stop under federal law. *See* Federal Motor Carrier Safety Regulations, 49 C.F.R. § 395.3(a) (1978). Miller presumably could have obviated this problem by stopping after having driven the maximum of ten hours and resting for the required eight hours.

quired. *Cannon v. Consolidated Freightways Corp.*, 524 F.2d 290, 293 (7th Cir. 1975).[11]

In its most recent examination of the nature of the fair representation duty, the Supreme Court said that if the quality of representation provided by the union is such that it "seriously undermines the integrity of the arbitral process," then "the bar of the finality provisions of the contract" is removed. *Hines v. Anchor Motor Freight, Inc., supra*, 424 U.S. at 567, 96 S.Ct. at 1058. The present record does not exonerate the union under this standard. So far as appears, the union's representation consisted solely of a perfunctory reading of Miller's *pro se* written grievances. No effort was made to urge the absence of the warning letter predicate to Miller's eight-day suspension. No investigation was made into the incident involving the height of the truck that gave rise to that suspension; nor was any attempt made to find witnesses to that incident or to obtain relevant records relating thereto.[12] The importance of that incident to the employer's right to discharge for the later misconduct seems not to have been noticed by the union representative. Faced with such a record, we cannot say Gateway has demonstrated the absence of any genuine issue as to any fact material to the question of fair representation.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

PELL, Circuit Judge, concurring.

It appearing to me that Judge Tone's opinion sufficiently demonstrates the inap-

---

11. The union's duty of fair representation is breached by union conduct that is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes, supra*, 386 U.S. at 190, 87 S.Ct. at 916; *See, e. g., Hines v. Anchor Motor Freight, Inc., supra*, 424 U.S. at 571, 96 S.Ct. at 1059; *Orphan v. Furnco Construction Corp., supra*, 466 F.2d at 803. Stronger language has sometimes been used: "There must be 'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971) (quoting *Humphrey v. Moore*, 375 U.S. 335, 348, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964)). "[T]he plaintiff must show that the Union's conduct was intentional, invidious and directed at that particular employee." *Cannon v. Consolidated Freightways Corp., supra*, 524 F.2d at 293 (citing *Motor Coach Employees v. Lockridge, supra* ).

Although evidence of intentionally hostile or invidious action by a union is clearly relevant to determining whether the duty of fair representation has been breached, the duty may be breached without scienter on the part of the union. "[P]atently wrongful conduct such as racial discrimination or personal hostility" is not the sole measure of what is prohibited. *Vaca v. Sipes*, 386 U.S. at 190–91, 87 S.Ct. at 917; *see Hines v. Anchor Motor Freight, Inc.*, 424 U.S. at 567–71, 96 S.Ct. at 1057–1059. A union also breaches its duty when it arbitrarily ignores or perfunctorily processes a grievance. *Id.* at 563, 569, 96 S.Ct. at 1055, 1058; *IBEW v. Foust*, 442 U.S. 42, 46, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979); *see, e. g., Archie v. Chicago Truck Drivers Union*, 585 F.2d 210, 219 (7th Cir. 1978); *Baldini v. Local 1095, UAW*, 581 F.2d 145, 150–51 & n.5 (7th Cir. 1978). *See generally* R. Gorman, *Labor Law* ch. 30, § 6 (1976).

12. As Professor Gorman has noted, the relevant inquiry is not "whether the union in fact pursues an employee's grievance," but rather "whether the union has made a full investigation, has given the grievant notice and an opportunity to participate, has mustered colorable arguments and has refuted insubstantial arguments by the employer." R. Gorman, *supra* note 11, at 718. Absent such action by the union, the arbitration process could become little more than a sham, and the rationale behind deference to the decisions of arbitration panels could be entirely undercut. "[A]dministration and grievance adjustment are performed by the union at a much lower 'level of visibility' and generality than contract negotiation, and are thus more readily subject to 'manipulation' by a willful union and more readily garbed with appearances of good faith or mere carelessness . . . ." *Id.* at 719. *See also Vaca v. Sipes, supra*, 386 U.S. at 182, 87 S.Ct. at 912; *Holodnak v. Avco Corp.*, 381 F.Supp. 191, 199–201 (D.Conn.1974), *modified on other grounds*, 514 F.2d 285 (2d Cir. 1975).

We note also that the duty of fair representation is of special importance when a grievance for wrongful discharge is involved. As the Fourth Circuit said, "A Union must especially avoid capricious and arbitrary behavior in the handling of a grievance based on a discharge—the industrial equivalent of capital punishment." *Griffin v. UAW*, 469 F.2d 181, 183 (4th Cir. 1972).

278

propriateness of summary judgment in this appeal, I concur in the result. Nevertheless, I do so with some uneasiness.

An important factor seems to have entered the picture: the matter of lack of a warning letter to Miller under the Union contract. In his amended complaint, Miller has only a passing reference to his having objected because Article 46 of the agreement required that he receive a written notice with an opportunity to correct the alleged improper act. The original brief filed by Miller in this court had no reference to his claim for reversal being in any way based upon noncompliance with Article 46. In the reply brief, the total reference to the warning letter was:

> . . . being the incident of June 22, 1976 in which a "voluntary quit" manuver [sic] was used as a means to try and avoid the provision of Article 46 of the National Master Freight Agreement which forbids such actions for a first offense.

The court on its own motion during oral argument, although the matter of the warning letter had not been urged to the panel other than as noted above, did inquire about the matter of the warning letter. The colloquy that followed threw no particular light upon the merits of such a claim. Aside from any question of waiver, the courts, it seems to me, walk on shaky ground in giving decisional significance to issues the parties have neither urged nor treated.

Further, it appears to me that the employer demonstrated a clear right of discharge on the merits. Miller was hired as a driver. Nevertheless, he twice demonstrated an intransigent position about carrying out management driving assignments. The business of getting the trucks over the road should not have to tolerate such a continuing refusal to accept managerial assignments. To the extent that the union representation may appear pro forma, it may well be attributable to the lack of merit of Miller's position.

In any event, the district court on remand will have the opportunity to develop fully the pertinent evidentiary facts.