HARASZTHY, Appellant,

v.

OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL
UNION, LOCAL 17, Appellee.

[Cite as *Haraszthy v. Office & Professional Emp. Internatl.*
*Union, Local 17* (1991), 74 Ohio App.3d 297.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 58440.

Decided May 28, 1991.

**298**

*Denise J. Knecht*, for appellant.

*Robert E. Sweeney Co., L.P.A.*, and *Lawrence M. Oberdank*, for appellee.

HARPER, Judge.

## I

Appellant, Emily Szabo Haraszthy, appeals from the judgment of the Cuyahoga County Court of Common Pleas which dismissed her breach of employment contract and negligence representation action against Kaiser Foundation Hospitals and appellee, Office and Professional Employees International Union, Local 17. The parties submitted a joint statement of facts, most of which are incorporated *infra.*

## II

Plaintiff, Emily Szabo Haraszthy, was employed by Kaiser Foundation Health Plan of Ohio ("Kaiser"), Cleveland, Ohio, as a medical technologist for more than six years. Defendant, Office and Professional Employees International, Local 17 ("union"), at all relevant times was the collective bargaining agent for Kaiser employees.

In February 1986, Kaiser and the union entered into a letter of agreement to reduce the Kaiser work force. This agreement was negotiated as a supplement to the existing collective bargaining agreement. The purpose of the letter of agreement was to define the terms of the reduction of employees. The union conducted meetings of all employees in the Kaiser unit on March 3 and 4, 1986, and an explanation of the appreciation package was presented to employees at those meetings. Haraszthy admitted on cross-examination that she attended all the union meetings. She further testified that she knew that if she accepted employment with Kaiser that she would lose her entitlement to the appreciation package.

Kaiser also prepared an explanation of the appreciation package and circulated it among employees.

The reduction in force was to be accomplished in phases and layoffs were to be made in accordance with seniority. A copy of the reduction phases was in Haraszthy's laboratory. An outplacement program was established to assist employees in obtaining jobs elsewhere. Employees who secured other employment prior to being laid off were permitted to leave with Kaiser's permission and were given the appreciation package. Employees were not given the appreciation package if they decided to remain in Kaiser's employ. No time deadline for accepting the appreciation package was given to employees. Haraszthy was to be the last in her department to be laid off during Phase IV of the reduction in force. Haraszthy would have preferred to remain a fulltime employee of Kaiser, but began receiving job placement

assistance in anticipation of her layoff. She actively sought new employment. Haraszthy would have received the appreciation package had the layoff list been followed.

Pratrap "Bob" Narayan, the union steward in Haraszthy's department, was planning to move to New York and voluntarily left in May 1986. Elke Chorodow, another employee at Haraszthy's department, also agreed to accept a voluntary layoff. Chorodow and Narayan had more seniority than Haraszthy and both received the appreciation package. Narayan was not scheduled to be laid off.

At some point, Haraszthy signed a document. The document's purpose was to determine if Haraszthy was interested in staying with Kaiser because of a fulltime position becoming available. Haraszthy signed that she would stay with Kaiser as a fulltime employee on forty hours a week, all shifts. She was no longer on the layoff list after she accepted the full time offer from Kaiser.

Thereafter, Haraszthy believed she was being assigned unfavorable shifts. Sometimes she would be assigned shifts so close together that she could only have four or five hours of sleep at night.

When her work schedule became unbearable, she telephoned Ben Adams, Kaiser's labor relations manager. She complained about the shift problem and claimed that she reminded him that she reserved her right to claim the appreciation package. Adams said he would check on the shift problem and get back to her. When Adams failed to respond, she claimed that she called him again and repeated her previous complaint and reservation to opt for the appreciation package. Adams never responded with information or assistance. Haraszthy claimed that her coworker, Kathy Blaxon, witnessed these conversations on an extension phone.

Haraszthy received a job offer from St. Luke's Hospital in July 1986. On August 1, 1986, Haraszthy gave Kaiser notice that she was resigning effective August 15, 1986. On August 14, 1986, Haraszthy was informed that she would not receive the appreciation package. Even after Haraszthy's departure from Kaiser, the layoffs continued and other employees received the package.

Haraszthy made several efforts on her own and through her attorney to acquire the appreciation package. Eventually Ben Adams recommended that she pursue a union grievance. Even though the deadline for filing a grievance had lapsed, both Kaiser and the union agreed to waive the timeliness issue.

Kathy Blaxon, Haraszthy's new union steward, had direct knowledge of the situation. She accepted and submitted the grievance on November 10, 1986.

Blaxon was subsequently fired from Kaiser and never participated in the process.

Kaiser denied the remedy sought by the grievance. The union carried the grievance to the third step hearing stage. Irene Summerfield, the union business agent, was identified as the union official to represent Haraszthy at the hearing scheduled for January 14, 1987.

Haraszthy claimed that she attempted several times to contact Summerfield prior to the hearing and was unable to reach her. Summerfield first talked with Haraszthy on the day of the grievance hearing. Prior to the hearing, Summerfield discussed the information with Ben Adams. Prior to the hearing, she did not discuss the grievance with Kathy Blaxon or any other of Haraszthy's coworkers who could have been witnesses.

At the hearing, Haraszthy was accompanied by her attorney, who was not permitted to attend. The attorney was asked to wait outside the hearing room. Blaxon did not testify.

No witnesses or documents were presented by the union, except that Haraszthy was permitted to give a statement. Kaiser again denied the grievance.

Haraszthy asked the union to pursue her grievance through fourth step arbitration, but the union never responded.

If Kaiser had given the appreciation package to Haraszthy, she would have received the following benefits:

| | |
|---|---|
| "Severance (8 weeks at $12.60 per hour) | $ 4,032.00 |
| "Pension-lump sum value | 10,466.00 |
| "Total | $14,498.00" |

### III

The trial court issued its findings of fact and conclusions of law on August 17, 1989. The court found that the union did not act in an arbitrary or discriminatory manner. The court found that the union's decision was rational and objective, and that it did not breach its duty of fair representation. We agree, and so we affirm.

### IV

Appellant, in her sole assignment of error, states as follows:

"The lower court erred in finding that the union did not breach its duty of fair representation where the union pursued Mrs. Haraszthy's grievance in an arbitrary and perfunctory manner."

This court notes that the duty of fair representation "is a federal obligation which has been judicially fashioned from national labor statutes." *Abrams v. Carrier Corp.* (C.A.2, 1970), 434 F.2d 1234, 1251. The National Labor Relations Act ("NLRA") does not explicitly impose a duty of fair representation; however, National Labor Relations Board and court rulings have established that under the Act, as under the Railway Labor Act ("RLA"), Section 151 *et seq.*, Title 45, U.S.Code, the union, as the sole collective bargaining agent of employees, has a duty to represent them fairly. The duty, therefore, is the product of a federal common law with its origin in the statute. See, also, *Textile Workers v. Lincoln Mills* (1957), 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. We note also that under the United States Supreme Court holding in *Vaca v. Sipes* (1967), 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842, state courts have jurisdiction over an action against a union by an employee for unfair representation.

The origins of this evolution can be traced to several cases decided by the United States Supreme Court under the RLA, the leading case being *Steele v. Louisville & Nashville Natl. RR.* (1944), 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. In the *Steele* case, a black employee sued the union to set aside a seniority system that discriminated against blacks. The United States Supreme Court ruled that since the RLA conferred exclusive bargaining authority on a union "without any commensurate statutory duty toward its members, constitutional questions arise." *Id.* at 198, 65 S.Ct. at 230, 89 L.Ed. at 181. The court continued, "the representative is clothed with power not unlike that of a legislature which is subject to constitutional limitations on its power to deny, restrict, destroy or discriminate against the rights of those for whom it legislates and which is also under an affirmative constitutional duty equally to protect those rights." *Id.* at 198, 65 S.Ct. at 230, 89 L.Ed. at 181. Thus, the *Steele* court became the first to hold that the statute implicitly "expresses the aim of Congress to impose on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." *Id.* at 202–203, 65 S.Ct. at 232, 89 L.Ed. at 183.

Later, in *Ford Motor Co. v. Huffman* (1953), 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048, the United States Supreme Court stated:

"[T]he authority of bargaining representatives ... is not absolute as recognized in *Steele* ... in connection with comparable provisions of the Railway Labor Act. Their statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interest of all of those members, without hostility to any." *Id.* at 337, 73 S.Ct. at 686, 97 L.Ed. at 1057.

As stated *supra,* the early definitions by the United States Supreme Court of the duty of fair representation impose on the bargaining agent the responsibility of representing the interests of all employees "fairly, impartially and in good faith." *Steele,* 323 U.S. at 204, 65 S.Ct. at 233, 89 L.Ed. at 184. The National Labor Relations Board ("board") defined fair representation in *Miranda Fuel Co.* (1962), 140 N.L.R.B. 181, reversed on other grounds (C.A.2, 1963), 326 F.2d 172, as giving employees the right "to be free from unfair or invidious treatment by their bargaining agent." *Id.* at 185.

■ Appellant contends that the union breached its duty of fair representation by ignoring a meritorious grievance by conducting its investigation in a perfunctory manner. Appellant further argues that the trial court erred to the prejudice of the appellant by concentrating its decision on the union's failure to pursue arbitration. Appellant argues that the union failed to properly investigate the matter, present proper evidence, or properly represent appellant, and that the union's failure to pursue arbitration was one of many violations of its statutory duties. We do not see any error in the trial court's holding. Appellant's complaint was based on unfair representation by the union. The court based its decision on the conduct of the union, which, when taken in total, did not constitute unfair representation as contemplated by the statute.

The United States Supreme Court, in *Vaca v. Sipes, supra,* which today is the leading case on unfair representation, defined when a union's "conduct towards a member is arbitrary, discriminatory or in bad faith," but it also provided a wide area of union discretion, subject only to the requirement of good faith. The court stated:

" '[T]hough we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration.'

"[I]f the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined * * * [and a] significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully." *Id.* at 191, 87 S.Ct. at 917, 17 L.Ed.2d at 858.

The United States Supreme Court, in *Street, Elec. Ry. & Motor Coach Emp. v. Lockridge* (1971), 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473, held that the " 'doctrine * * * carries with it [in order to prove a breach of duty] the need to adduce substantial evidence of discrimination that is intentional,

severe and unrelated to legitimate union objectives * * *.' " *Id.* at 301, 91 S.Ct. at 1925, 29 L.Ed.2d at 491.

In *Hines v. Anchor Motor Freight* (1976), 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231, the United States Supreme Court held that "the burden of demonstrating breach by the union * * * involves more than demonstrating mere errors in judgment." *Id.* at 570–571, 96 S.Ct. at 1059, 47 L.Ed.2d at 245. Appellant contends that had the union properly interpreted the agreement of the benefit package offered to employees, and taken its time to interview witnesses, the appellant would have received her benefits. Appellee argues that the union representatives who bargained for the appreciation package with Kaiser understood the contents of the agreement better than Haraszthy. Appellee further contends that its understanding of the agreement with Kaiser was such that appellant was not entitled to the benefit if she continued in the employment of Kaiser as appellant did. In light of this understanding, the only argument left for the union is whether promises were made to appellant as she claimed. Appellee argues that it presented the issue of promises made before Kaiser representatives in the third phase of the grievance proceedings. Appellee contends that when Kaiser denied that it made promises to appellant, there was no need for the submission of the issue to arbitration.

We note that in spite of the efforts of the United States Supreme Court to characterize the nature of the duty of fair representation, lower federal courts have consistently disagreed on identifying the essential elements of the duty.

The Eighth Circuit Court of Appeals, in *Smith v. Hussman Refrigerator Co.* (C.A.8, 1980), 619 F.2d 1229, 1236, stated:

" '[T]he scope of the duty of fair representation has never been precisely defined; it "is a legal term of art, incapable of precise definition," and calls for an ad hoc review of each factual situation.' "

The Third Circuit, in *Medlin v. Boeing Vertol* (C.A.3, 1980), 620 F.2d 957, 961, held:

"To violate the duty * * * it is necessary that the union act with a bad faith motive * * *. In order to state a claim for breach of this duty, it is essential that plaintiffs allege a bad faith motive on the part of the union."

Several courts have equally ruled that the union can breach its duty of fair representation even without bad faith shown. In *Miller v. Gateway Transp. Co.* (C.A.7, 1980), 616 F.2d 272, 277, the Seventh Circuit held:

"Although evidence of the intentionally hostile or invidious action by a union is clearly relevant to determining whether the duty of fair representation has been breached, the duty may be breached without scienter on the part

of the union * * *. A union also breaches its duty when it arbitrarily ignores or perfunctorily processes a grievance."

The Fourth Circuit stated in *Wyatt v. Interstate & Ocean Transp. Co.* (C.A.4, 1980), 623 F.2d 888, 891, held that:

"[I]t is not necessary that the union's breach be intentional. A union representative could be so indifferent to the rights of members or so grossly deficient in his conduct purporting to protect the rights of members that the conduct could be equated with arbitrary action."

In *National Labor Relations Bd. v. Postal Workers* (C.A.8, 1980), 618 F.2d 1249, 1255, the Eighth Circuit held that " '[a]rbitrary conduct alone may suffice to establish a violation of the duty of fair representation' but that '[m]ere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation.' "

The Ninth Circuit in *Price v. Southern Pac. Transp. Co.* (C.A.9, 1978), 586 F.2d 750, 754, concluded that:

"The record provides no showing of ill will, prejudice or deliberate bad faith on the part of the Union. * * * Nor does it show unintentional conduct 'so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.' "

In dismissing the action against the union, the *Price* court observed that the union performed its duty in a " 'manner that was better than inadequate, but less good than zealous. This falls far short of constituting irrational, intentional, or egregiously unfair unintentional conduct on the part of the Union.' " *Id.* at 754.

Appellant contends that the union's performance was perfunctory. What constitutes "perfunctory" or "arbitrary" representation comes up frequently in actions against a union for unfair representation. Many courts have suggested that negligence alone does not constitute unfair representation and that "inadequate representation" without bad faith is not a breach of duty. *Dill v. Wood Shovel & Tool Co.* (S.D.Ohio 1972), 80 LRRM 2445, 1972 WL 795; see *Cannon v. Consol. Freightways Corp.* (C.A.7, 1975), 524 F.2d 290. The issue is the subjective state of representation, not the level of expertise with which it is conducted.

Appellant cites the Sixth Circuit decision in *Ruzicka v. General Motors Corp.* (C.A.6, 1981), 649 F.2d 1207, 1211, which states that "negligent failure" to comply with the contractual time limitation for filing grievances amounted to a "clear example" of "arbitrary and perfunctory" handling of a grievance in violation of the union's duty of fair representation.

However, the *Ruzicka* court did not end there. It remanded the case back to the trial court, holding that the union's failure to file a timely grievance

would not amount to a breach of the duty of fair representation if the union's failure "was due to reliance on prevailing practice of freely granting extensions" of time to file grievances. *Id.* at 1211. The inquiry in every fair representation case, therefore, must be to determine whether the specific factual situation shows hostile discrimination based on irrelevant and invidious conditions, or is within a wide range of reasonableness granted bargaining agents. See *Steele* and *Huffman, supra.*

■ In the case at bar, this court agrees with the trial court that the union's handling of appellant's case was better than inadequate, and lacked professionalism. Nonetheless, we fail to see considerable negligence in the decision; rather, we perceive the decision as being within the "range of reasonableness." We do not hesitate to note that the continuous existence of any union is based on the continued care of the welfare of its members. For that reason, there is a presumption that a union's representation of its members is done in good faith. However, this presumption is rebuttable, by the showing of arbitrariness, discrimination, bad faith, or an attitude that on its face no reasonable person can conclude is expected of a representative. We hold, therefore, that the evidence adduced by appellant was insufficient to show that the union acted arbitrarily, discriminatorily, or in bad faith. Appellant's assignment of error is overruled. The trial court's judgment is affirmed.

*Judgment affirmed.*

KRUPANSKY, C.J., concurs.

JOHN F. CORRIGAN, J., concurs in judgment only.