723 F.2d 598
 33 Fair Empl.Prac.Cas. 666,
33 Empl. Prac. Dec. P 33,956
Larry TATE, Edward Woodus, Samuel Walters and Annie Carter, Appellants,
v.
WEYERHAEUSER COMPANY and United Paperworkers Local Union
619, Appellees.
 No. 83-1277.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 16, 1983.
Decided Dec. 9, 1983.
 
 Michael Hamilton, Legal Dept., United Paperworkers Intern. Union, Nashville, Tenn., for appellee, United Paperworkers Intern. Union, Local 619.
 Spencer F. Robinson, Ramsay, Cox, Lile, Bridgforth, Gilbert, Harrelson & Starling, Pine Bluff, Ark., for Weyerhaeuser Co.
 Ben Johnson, Jr., Pine Bluff, Ark., for appellants.
 Before McMILLIAN, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 Plaintiff Larry Tate sued defendant Weyerhaeuser Company under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Secs. 2000e to 2000e-17, and under 42 U.S.C. Sec. 1981.[1] Plaintiff brought suit on his own behalf and on behalf of a class of all black employees, past, present and future, of Weyerhaeuser. He alleged that Weyerhaeuser maintains "racially discriminatory policies, practices, customs and usages in discharging, hiring, promotion and all terms and conditions of employment." Prior to the class certification hearing, Samuel Walters and Edward Woodus intervened alleging violations of Title VII and Sec. 1981; Annie Carter intervened alleging violations of Sec. 1981.[2] In addition, Walters and Carter alleged racial discrimination by United Paperworkers International Union, Local 619 in representing black employees. For convenience, all these individuals will be referred to as plaintiffs or appellants.
 
 
 2
 After a pretrial class hearing the district court refused to certify the class on the grounds that the Rule 23(a)(1) numerosity requirement and the 23(a)(3) typicality requirement had not been met. Because we believe that the district court did not abuse its discretion in refusing to certify the class, we affirm its decision on that question.
 
 
 3
 The case proceeded to trial on a disparate treatment theory. The court held that plaintiffs had each established a prima facie case of race discrimination against Weyerhaeuser and that Weyerhaeuser had met its burden by proving by a preponderance of the evidence that Weyerhaeuser had legitimately and nondiscriminatorily applied its disciplinary policy in discharging each plaintiff. The court further held that plaintiffs had failed to prove by a preponderance of the evidence that the reasons offered by Weyerhaeuser were pretextual. It concluded that they failed to carry the ultimate burden of proving intentional discrimination. Similarly, the court found that Carter and Walters had failed to carry the burden of proving intentional discrimination by the union, which was not required to pursue grievances for members whose conduct was so extreme that there was no merit to their claims. Because we believe that the district court's findings that plaintiffs failed to prove pretext and intentional discrimination are not clearly erroneous, we affirm.
 
 I. Background
 
 4
 Plaintiffs are former black employees of Weyerhaeuser Company. All alleged that they were discharged because of their race.[3] Plaintiffs Walters and Carter asserted claims against the union alleging that the union refused to represent them because of their race.
 
 Larry Tate
 
 5
 Tate began his employment with the Weyerhaeuser Company Multiwall Bag Plant in Pine Bluff, Arkansas, on September 17, 1973. Until his suspension on May 17, 1979, he worked in various positions for the company. David Guffy, Tate's supervisor, testified that on the Monday morning preceding the suspension he was reviewing time sheets to ensure that another employee's time sheet reflected funeral leave. He noticed that Tate's sheet showed twelve hours overtime for the week before. When Guffy had signed the time sheet on the previous Friday, it had not shown the overtime. Guffy took the time sheet to his supervisor, Charles Allred. Allred called Tate in along with his union steward to ask if he had actually worked the overtime. Tate stated that he had not worked the hours and he did not know who put the hours down. The hours on the time sheet were corrected.
 
 
 6
 Allred brought the discrepancy to the attention of Shirley Brown, the personnel manager, and Bill Southard, the plant manager. Brown examined Tate's time sheets for the period from January to mid-May, 1979, discovering several questionable erasures and hours. She then contacted Glenn Minton, the security manager for Weyerhaeuser. On May 17, 1979, Minton, Brown and Tate met and discussed these time sheets. After going through the sheets once, Tate said they were accurate. Minton asked Tate to review the sheets once more; Tate pulled out three time sheets and admitted that they reflected hours he had not worked. He admitted cashing the checks and spending the money.
 
 
 7
 Pending further investigation, Tate was suspended. Weyerhaeuser gave the information concerning the overpayments to the Jefferson County Prosecuting Attorney's Office. Tate was tried and found guilty of "Theft of Property Delivered by Mistake."[4] He subsequently was fired on October 12, 1979, for violating Article 23, Group II, paragraph K of the collective bargaining agreement, theft of company property.
 
 Annie Carter
 
 8
 Annie Carter commenced her employment with Weyerhaeuser in January, 1972. Carter was fired for falsification of company records on July 17, 1978, the first day that she returned to work after she pled guilty to a charge of "Theft of Property by Deception."[5] Falsification of company records is a violation of Article 23, Group II, paragraph L of the collective bargaining agreement.
 
 
 9
 Carter had submitted to the State of Arkansas Social Services Department five fraudulent letters purporting to be from Weyerhaeuser and setting forth false information concerning her wages. Although the signature on each letter purported to be that of Shirley Brown, the personnel manager, and four of the letters were on company letterhead, Brown testified that she did not write or sign the letters.
 
 Ed Woodus
 
 10
 Ed Woodus was hired in August, 1978. The company fired him on October 14, 1980 for being the aggressor in a fight on company property while at work, a violation of Article 23, Group II, paragraph D of the collective bargaining agreement. The altercation between Woodus and a white employee, Harold Hollis, occurred on October 7, 1980 during the afternoon shift. Woodus testified that he told Hollis to speed up his work and that Hollis called him a "slow-ass nigger." He pointed at Hollis, but did not touch him. Hollis testified, however, that when Woodus called him a "slow-assed white boy," he returned the slur and Woodus hit him in the mouth.
 
 
 11
 On the day of the fight, Woodus and Hollis were taken by Guffy, their supervisor that day, to see Allred, the production superintendent. Johnny Frye, the international representative for Local 619, was also present at the meeting. Allred testified that Hollis had a red mark on his face and blood in the corner of his mouth. Guffy stated that Hollis appeared to have been hit. Both employees were suspended pending an investigation. Brown testified that an investigation revealed three employees who saw Woodus hit Hollis. One of those employees, a black woman, Dorothy Johnson, verified her story at trial. Woodus was terminated after the investigation revealed that he was the aggressor in the fight.
 
 Sam Walters
 
 12
 Weyerhaeuser Company hired Sam Walters on September 28, 1977. He was fired on January 4, 1980, after accumulating four active violations of minor Group I offenses. Walters received his first reprimand on December 5, 1978 from his black supervisor, Leonard Higgins, for habitual tardiness/absenteeism (32 incidents). The second reprimand was given on February 20, 1979 by the same supervisor (three incidents).
 
 
 13
 Although Walters did not allege that the first two reprimands were racially motivated, he claimed that his third reprimand and his discharge were racially motivated. The third reprimand was given on November 7, 1979 for 27 incidents by a white supervisor, John Curtis. Curtis counselled Walters regarding Walters' absences on December 5, 1979, and warned him that he would have to improve his record because another reprimand could subject him to discharge. During the next eighteen working days Walters was tardy on eight occasions.
 
 
 14
 The final or fourth reprimand was issued to Walters for failure to notify the company that he was going to be absent from the graveyard shift on January 2, 1980. Walters testified that he was asked to stay with a sick uncle because women were not permitted to remain in the hospital's semi-private rooms. He testified that he tried to call Weyerhaeuser between 8:15 and 9:30 that evening and that his mother tried to call. A nurse at the hospital also testified that she called once for Walters but could not get an answer.
 
 
 15
 Company officials testified that on the day in question many employees called into the office during and after normal office hours. The collective bargaining agreement allows employees to report in four hours prior to the beginning of the shift, but Brown, the personnel manager, conceded that employees were allowed to call right up to the time the shift started in order to avoid a no report. In addition, Walters failed to call in six hours prior to returning to work after the absence.
 
 II. Analysis
 
 16
 Each of the appellants relies on a disparate treatment theory to establish a case of discriminatory discharge.[6] In order to establish a prima facie case of discriminatory discharge, each appellant must show that he or she was a member of a protected class, was capable of performing the job, and was discharged from the job. See Boner v. Board of Commissioners, 674 F.2d 693, 696 (8th Cir.1982); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1253 (8th Cir.1981), citing Osborne v. Cleland, 620 F.2d 195, 198 (8th Cir.1980). Establishing the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the discharge. Johnson, supra, 646 F.2d at 1254. The employer is only required to present admissible evidence sufficient to raise a genuine factual issue as to whether the plaintiff was discriminated against. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once the defendant has offered evidence of the reason for the plaintiff's discharge, the McDonnell-Burdine presumption arising from the establishment of the prima facie case "drops from the case" and "the factual inquiry proceeds to a new level of specificity." Burdine, supra, 450 U.S. at 255, 101 S.Ct. at 1094. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains on the plaintiff. See United States Postal Service Board of Governors v. Aikens, --- U.S. ----, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (hereinafter Aikens).
 
 A. Claims Against Weyerhaeuser Company
 
 17
 Appellants contend that the district court erroneously concluded that Weyerhaeuser Company had rebutted their prima facie case by articulating a legitimate and nondiscriminatory reason for the different treatment of similarly situated whites. They argue that they "went further than was required by Kenyata (sic), forcing the Appellees to explain ... why white employees committing offenses of comparable seriousness to those of which appellants had been accused had not been discharged."[7]
 
 
 18
 Appellants' argument is premised on an erroneous application of the burdens of going forward with the evidence and persuasion in this case. Once appellants establish their prima facie case, Weyerhaeuser must articulate a legitimate and nondiscriminatory reason for the discharge of each appellant. See Burdine, supra; Johnson, supra. The appellants, however, retain the burden of persuasion. Aikens, supra. They must demonstrate that the proffered reason was not the true reason for the discharge. Burdine, supra, 450 U.S. at 256, 101 S.Ct. at 1095. This can be done by "persuading the court that a discriminatory reason more likely motivated the employer" or by "showing that the employer's proffered explanation is unworthy of credence." Id. See also Danzl v. North St. Paul-Maplewood-Oakdale Independent School District, 706 F.2d 813, 816 (8th Cir.1983). The appellants offered evidence that Weyerhaeuser's supervisory employees made racial slurs and that black employees were treated differently from white employees. It was incumbent on the appellants to show a similarity between their conduct and that of white employees who were treated differently and not on Weyerhaeuser to disprove their similarity. See Johnson, supra, 640 F.2d at 1255. The principal issue in this case then is whether the appellants carried the ultimate burden of proving intentional discrimination.
 
 
 19
 Tate, Carter and Woodus were discharged for Group II violations under the collective bargaining agreement, including, respectively, theft of company property, falsification of company records, and being the aggressor in a fight. They submitted evidence of incidents involving a number of white employees who allegedly committed Group II offenses and who were not discharged. On appeal, they argue that despite the lack of any evidence in the record, the district court concluded that some Group II offenses were less serious than others; based on this erroneous conclusion, the court then distinguished incidents involving white employees. In addition, they contend that Weyerhaeuser failed to explain why some white employees such as Ed Harness and Billy Patterson were treated with leniency while black employees such as Tate, Carter and Woodus were not. After careful review of the record, the exhibits and the district court's findings, we are satisfied that the district court's decision in favor of Weyerhaeuser was not clearly erroneous. See Pullman-Standard v. Swint, 456 U.S. 273, 287-290, 102 S.Ct. 1781, 1789-91, 72 L.Ed.2d 66 (1982).
 
 
 20
 The first series of incidents allegedly showing pretext involved overpayment of white employees who were not disciplined. The district court found that "the defendant followed its policy of only deducting from a later paycheck an overpayment made due to company error in the case of a Black employee, Velma Kentle, who had received a $200.00 vacation overpayment." Designated Record at 100 (hereinafter D.R.). Appellants argue that, because of this erroneous finding, the court gave the evidence of overpayments of white employees less weight than it should have. Although the district court was incorrect because Velma Kentle returned the vacation check without cashing it, we cannot say that the district court was erroneous in concluding that the company did not treat overpayments due to company error as theft of company property and that it followed a policy of deducting overpayments from subsequent paychecks. Juanita Moore, a white employee, was overpaid $76 due to a supervisor's incorrect coding of her time sheet for the pay rate. Another white employee, Martha Lowry, was overpaid when the payroll clerk did not notice a shift swap notation and mistakenly paid Lowry at the overtime rate. Bufford Reynolds, a third white employee, received a second vacation check through company error. Each of these incidents involved accidental overpayment by the company. Tate failed to establish that the conduct was similar enough to prove pretext in the discharge of Tate.
 
 
 21
 Another incident allegedly establishing pretext involved some questionable hours on the time sheets of a white employee, Phyllis Covington. These hours were discovered subsequent to the Tate incident during a review by Shirley Brown of every production employee's time sheets. Covington, unlike Tate, unequivocally denied any wrongdoing. She insisted that she had worked all the hours on her time sheet and that she had only received money to which she was entitled. The company investigation revealed that Covington could have worked the hours. The district court found that "the critical difference in Covington and Tate is that Tate admitted having received money for hours not worked and he kept it." D.R. at 99. The court's conclusion that the Covington incident was not sufficiently comparable to Tate's to permit an inference of disparate treatment is not clearly erroneous. Whether or not the district court concluded that some Group II offenses are more or less serious than others is irrelevant here because neither the appellants nor the company could show that Covington had committed a Group II offense. Finally, there was evidence that two white employees, Paul Wright and Walter Shepard, had been fired for theft of company property.
 
 
 22
 The district court concluded that Carter also failed to demonstrate pretext in her discharge for falsification of company records. The record supports the district court's conclusion that Carter did not offer any evidence that white employees of the Multiwall Bag Plant had been allowed to falsify company records without being dismissed. In fact, Shirley Brown, the personnel manager, testified that the only two other employees discharged for falsifying company records were two white employees, Ed Kelly and Benny Sander.
 
 
 23
 Appellants attempted to show pretext in the reasons given for their respective discharges by comparing the treatment of several white employees such as Roy Clark, Billy Cotton, Thomas Harness, Keith Marks, Billy Patterson, and Ed Harness. The Clark and Cotton incident involved the falsification of an accident report or of a truck log. They were not employed by the Multiwall Bag Plant, but rather by the trucking division, Weyerhaeuser Corporate Fleet. None of the supervisory personnel at the Multiwall Bag Plant participated in the decisions regarding these truck drivers. The district court was not clearly erroneous in questioning the relevance of this incident and in finding it distinguishable. The record supports the finding that the company forced Clark and Cotton to drive excess hours necessitating the falsification of the log. The testimony was confused as to what was falsified. Appellants simply failed to establish that the incidents were similar enough to prove pretext.
 
 
 24
 Tom Harness and Keith Marks were suspended pending an investigation when a supervisor saw them holding some marijuana. At that time, the collective bargaining agreement provided for dismissal under Group II for bringing or consuming the drugs, but not for possessing them on company property. Harness and Marks claimed they found the marijuana. There was no evidence otherwise. Because of the loophole in the agreement, Weyerhaeuser could not fire the two. As in the case of Carter and Tate, the matter was referred to Jefferson County authorities. The record supports the district court's findings and conclusion that this incident was not similar to that of employees discharged for violations of Group II.
 
 
 25
 Appellants also rely on an incident involving Billy Patterson. Another white employee, Donna Torres, saw Patterson drunk on the job and carrying a liquor bottle. This was clearly a Group II offense for which Patterson was subject to discharge. Although the district court made no specific finding regarding this incident, we cannot say that it warrants reversal. Rule 52(a) does not require that the district court deal with every piece of evidence in the record. The appellate court simply wants "the assurance that the trial court has come to grips with apparently irreconcilable conflicts." See E.E.O.C. v. Federal Reserve Bank of Richmond, 698 F.2d 633, 640 (4th Cir.1983), petition for cert. granted sub nom., Cooper v. Federal Reserve Bank of Richmond, --- U.S. ----, 104 S.Ct. 334, 77 L.Ed.2d ---- (1983). See also Garner v. St. Louis Southwestern Railway Company, 676 F.2d 1223, 1228 (8th Cir.1982). The district court clearly came to grips with the issue of whether or not white employees had been treated differently than black employees. In any event, the Patterson incident was inconclusive. Torres did not know if the supervisor had seen Patterson with the bottle of liquor. She did not tell the supervisor or any other member of management that she had seen Patterson drinking. According to Torres, the supervisor told Patterson to go home. But there was no evidence that the supervisor was aware Patterson was drunk.
 
 
 26
 Tate, Carter and Woodus also submit that pretext is evidenced by Weyerhaeuser's granting leniency to Ed Harness, a white employee who had been intoxicated on the job in 1976, who took a swing at, but did not hit, a supervisor while being escorted out of the plant and who crashed into an access bridge maintained by Weyerhaeuser while driving away. The appellants correctly suggest that the subjectivity of the administration of the disciplinary system may be probative of pretext. We cannot say, however, that this single incident of leniency for a clearly established Group II violation warrants reversal of the district court's finding in favor of Weyerhaeuser.
 
 
 27
 The collective bargaining agreement recognizes that there might be situations where leniency by the management could be afforded. It provides that "... [r]eprimands or warnings which have been given through leniency in lieu of suspension or discharge as set forth above, in Causes for Discharge, will be considered in determining the disciplinary penalty to be applied in cases of subsequent serious offenses." DX 8. The record supports the conclusion that the supervisors involved in the Harness incident, Guffy and Higgins, did not object when the Plant Manager, Shorty Low, decided to grant leniency. Moreover, the Weyerhaeuser Multiwall Bag Plant had three plant managers during the period in question: Shorty Low, 1964-early 1977; Tom Garner, early 1977-late 1978; William Southard, 1978-late 1981. Although a change in managers is not a defense to claims of racial discrimination, in this case the change suggests a basis other than racial for the difference in the treatment of Harness as compared with that of Tate, Carter, and Woodus. There was evidence that Low recommended leniency for two black employees as well as Harness.
 
 
 28
 Finally, the appellants offered evidence of racial slurs made by supervisors and other employees. Giving due regard to the district court's opportunity to judge the credibility of the witnesses and to resolve conflicts in testimony, Bowers v. Kraft Foods Corp., 606 F.2d 816, 818 (8th Cir.1979), we cannot say that this evidence proved intentional discrimination. In one instance, Carter simply did not know if the "name caller" was a supervisor with the company. In other instances, supervisory employees denied making the statements.
 
 
 29
 Walters argues that there is no evidence in the record that Weyerhaeuser had adopted a policy in August, 1977 that absences documented by a doctor's excuse would not be counted against employees for purposes of determining whether or not the employee had violated the collective bargaining agreement. Thus, he contends, the district court failed to give appropriate weight to the absentee and reprimand records of two white employees, Jean Stuckey and Sonja Freeman. But there was evidence in the record to support the policy. Brown, Weyerhaeuser's personnel manager, testified that absences documented by doctors' statements would be excused and not counted against the employee. Walters attempts to impeach her testimony by arguing that her earlier responses to the E.E.O.C. are inconsistent with her testimony at trial because she listed more absences for the E.E.O.C. than she gave at trial for various employees. Brown explained that she had listed all absences, including both excused and unexcused, for the E.E.O.C.
 
 
 30
 Walters presented evidence that Stuckey and Freeman had more occurrences than he did before they received a reprimand. The evidence showed that Freeman had thirty-one and Stuckey fifteen unexcused occurrences before they received their first reprimand. Walters had thirty-two. Indeed, the evidence showed that all of the twenty-three white employees reprimanded for habitual tardiness or habitual absenteeism received their first reprimand for fewer occurrences than did Walters. Brown testified, based on company records for the period 1977-1980, that white employees received a first reprimand for an average of 15.3 occurrences, blacks for an average of 21.9 occurrences, whites received a second reprimand after 14.6 occurrences and blacks after 12.4. Whites received their third reprimand after an average of 12.4 occurrences and blacks after 18.5.
 
 
 31
 Although the company's highly subjective disciplinary policy for tardiness and absences left enforcement to the discretion of the supervisors, this does not establish racial discrimination. Walters simply failed to show discrimination based on race.
 
 
 32
 Walters also alleged that he received his fourth and final reprimand because of his race. Walters presented evidence that he tried to call Weyerhaeuser on the night in question and explain that he would not be there. But the company rebutted by explaining the system under which calls were answered. Although the court made no specific finding on the credibility of Walters' excuse for not informing Weyerhaeuser, it did find that he was justly discharged. Furthermore, Walters failed to notify Weyerhaeuser that he was returning to work, a clear violation of the collective bargaining agreement. We cannot say that the district court was clearly wrong in finding that Walters failed to prove pretext and intentional discrimination.
 
 
 33
 B. Claims against Local 619 of United Paperworkers International Union
 
 
 34
 Carter and Walters alleged that the union had discriminated against them because of their race in failing to represent them. This court has recognized that causes of action for racially motivated failure to represent can lie against a labor union under Title VII and under 42 U.S.C. Sec. 1981. See Jennings v. American Postal Workers Union, 672 F.2d 712 (8th Cir.1982). See also McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 284-85, 96 S.Ct. 2574, 2580-81, 49 L.Ed.2d 493 (1976). The question of what the plaintiff in such an action must show to establish a prima facie case remains unresolved. We do not grapple with it here, for the case has been fully tried on the merits, and even if we concede arguendo the existence of a prima facie case against the union, we nevertheless affirm the findings of the district court that neither Carter nor Walters succeeded in carrying the ultimate burden of proving intentional discrimination.
 
 
 35
 Carter had requested that the union file a grievance on her behalf. Rendell Harrison, then president of the local union, told Carter that there was nothing that the union could do about her discharge. Although Jean Kelly, the grievance chairman, drafted a grievance, Harrison refused to process it. Harrison continued to refuse even after Carter presented a letter in her behalf. Walters also asked the union to file a grievance in his behalf regarding his fourth and final reprimand. Kelly, however, told him that there was nothing she could do for him.
 
 
 36
 The district court found that Carter had not shown that the union was motivated by racial considerations in refusing to file Carter's grievance. Although the union represented Thomas Harness, Keith Marks and Billy Cotton, the court concluded that these situations were not similar to Carter's. The incident involving Harness and Marks was distinguishable because bringing drugs onto or using them on company property was a Group II offense, but possession of drugs was not. In regard to the incident involving Cotton, the court specifically found that there was a "world of difference between falsifying an accident report or truck log ... and taking company stationery, falsely stating income and forging a company official's signature in order to obtain a government benefit." D.R. at 101-02. The district court also found in favor of the union in Walters' case because there was no credible evidence that Walters had been treated differently because he was black; like Carter, Walters had failed to prove intentional discrimination. Walters' absentee/tardiness record was "dismal and unjustifiable." D.R. at 107.
 
 
 37
 Carter and Walters argue that the union failed to articulate legitimate and nondiscriminatory reasons for failing to file grievances on their behalf. They contend, as they do in the appeal of their claim against Weyerhaeuser, that the union was required to explain why no grievances were filed for similarly situated blacks. Carter and Walters, however, have the burden of proving that blacks were treated less favorably than similarly situated whites. Absent such proof, the union need only articulate a legitimate reason for its actions. Unions are not required to pursue unmeritorious grievances. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
 
 
 38
 According to Carter, the union, unlike the district court, did not argue that the offense committed by Cotton and Clark was inherently less serious than the one committed by Carter to justify its presentation of grievances on Cotton's and Clark's behalf and its failure to present one on Carter's behalf. This single incident, however, does not provide a persuasive basis for a finding of intentional discrimination. The district court noted that there was a conflict of testimony over whether an accident report had been falsely filed by Cotton or whether the truck log had been altered. Cotton did not testify. Documentary evidence suggested that Cotton had been reprimanded for falsifying company records. But his co-driver, Clark, testified that the company had sent them out knowing that they did not have sufficient legal hours to make the run and then had discharged them for falsifying the truck log. Under the circumstances, we cannot say that Carter proved that the incident was similar enough to her own to establish pretext.
 
 
 39
 The union did not contest the company's failure to take disciplinary action in regard to Carter within the five days required by the collective bargaining agreement. Carter suggests that this is evidence of discrimination by the union. Brown, Weyerhaeuser's personnel manager, received a subpoena dated June 21, 1978 for the payroll records and for her appearance in court on July 11, 1978 at Carter's trial on criminal charges. Carter was arrested while at work in front of a number of supervisory employees; she was not discharged until after she returned to work subsequent to her guilty plea. Brown testified that she had not seen the falsified letters until the day of the trial, so until then the company did not have any documentation of Carter's offense. On this evidence, we cannot say that the district court was clearly wrong in finding that the union's actions were free from racial motive. Carter testified that on a previous occasion the union had filed a grievance for her, and she conceded that because the union had taken her money through the years she felt it should go ahead and at least file a grievance in this instance.
 
 
 40
 Finally, Carter and Walters argue that the union could not articulate a nondiscriminatory reason for its refusal to file a grievance on their behalf merely by cross-examining plaintiffs' witnesses. But the union's failure to present direct testimony subsequent to plaintiffs' case was not a failure to articulate a nondiscriminatory reason for its actions. In this case, the evidence supporting the union's nondiscriminatory reasons was provided by Carter's and Walters' own witnesses. The ultimate burden of persuading the trier of fact that a defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. Burdine, supra, 450 U.S. at 253, 101 S.Ct. at 1093. Carter and Walters could and did attack the union's actions on direct examination; thus, it hardly can be said that the union's cross-examination of plaintiffs' witnesses for the purpose of showing a nondiscriminatory reason for its actions was impermissible. Cf. Lewis v. Brown & Root, Inc., 711 F.2d 1287, 1290 n. 3 (5th Cir.1983).
 
 C. Class Certification
 
 41
 Larry Tate, in addition to his own claim of racial discrimination, sought to maintain a class action in accordance with Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. The issue stipulated by the parties and heard and decided by the court in the class certification hearing was whether or not Tate could represent a class composed of all past, present, and future black production employees of Weyerhaeuser's Pine Bluff plant allegedly adversely affected by the company's disciplinary policies. After a pretrial class hearing, the district court denied certification of the suit as a class action on the grounds that the typicality and numerosity requirements of Rule 23 had not been met. For the reasons discussed below, we cannot say that in so ruling the district court abused its discretion.
 
 1. Typicality
 
 42
 Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Typicality has been given an "independent meaning" by this court's holding that Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." Donaldson v. Pillsbury Co., 554 F.2d 825, 830 (8th Cir.1977). In Donaldson, the plaintiff contended that there was widespread discrimination based on patterns and practices not unique or special to herself. She produced affidavits of other employees who claimed to have been victims of some form of bias in promotional opportunities such as different hiring offices for men and women; lower wages for women and minority group males; subjective evaluations; promotion of whites, rather than blacks with more seniority; and exclusion of women and blacks from company-sponsored educational programs.
 
 
 43
 Similarly, Tate attempted to show something beyond his general allegation that unnamed blacks had been discriminated against. See Paxton v. Union National Bank, 688 F.2d 552, 562 (8th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983). The district court, however, concluded that Tate was primarily challenging his discharge. Although Tate presented evidence that eighteen, possibly nineteen, other individuals had received minor reprimands, four of these employees no longer worked for Weyerhaeuser. The other fourteen, possibly fifteen, had received reprimands all of which had been expunged from their records under the collective bargaining agreement and company policy, which provides that reprimands for minor offenses will be expunged if the employee has not received any disciplinary action for one year. Under these circumstances, the district court believed that Tate's discharge did not present claims or defenses typical of the class as a whole, but rather, involved a special and unique situation. We cannot say this conclusion was an abuse of discretion.
 
 2. Numerosity
 
 44
 Under Rule 23(a), the class must be "so numerous that joinder of all members is impracticable." We cannot say that the district court abused its discretion in holding that Tate had failed to establish numerosity. The potential discharge class of seven former employees was not so numerous as to require class certification. See Paxton, supra; Tuft v. McDonnell Douglas Corp., 581 F.2d 1304 (8th Cir.1978) (separate classes of 13 and 11 too small to require certification). Four of the seven discharged employees were already parties to the action. The district appropriately considered that trying the individual suits would not be inconvenient because it could examine the factual basis of the discipline in each employee's case and ascertain if white employees committing similar violations of company rules had been treated differently. See Paxton, supra, 688 F.2d at 559.
 
 
 45
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Tate also brought an action based on 42 U.S.C. Sec. 1985(3) alleging conspiracy by William Southard and Shirley Brown, individually and as employees of Weyerhaeuser. The conspiracy charges were dismissed prior to trial
 
 
 [2]
 A fifth former employee, Kenneth Higgins, was allowed to intervene based on similar violations of federal law as expressed by the others. Higgins has not appealed the decision of the district court
 
 
 [3]
 The collective bargaining agreement between Weyerhaeuser Company and the United Paperworkers International Union provides for two forms of discipline. The agreement provides a progressive disciplinary system for the commission of a Group One offense. Written reprimands are given for a violation. Upon receipt of the fourth written reprimand, the employee is terminated. Group II offenses are considered more serious offenses and may result in immediate discharge. Tate, Woodus and Carter were discharged for committing Group II offenses. Walters was discharged for receiving his fourth written reprimand under Group I
 
 
 [4]
 The Arkansas Court of Appeals reversed the conviction because Tate was found guilty of "Theft of Property Delivered by Mistake," a crime which the Arkansas court concluded was not a lesser included offense of "Theft of Property," the crime with which Tate was charged
 
 
 [5]
 Annie Carter was fined $1,000.00 and given a one-year suspended sentence
 
 
 [6]
 The principles for allocating the burden of proof in Sec. 1981 suits are the same as those employed in Title VII actions. Kenyatta v. Bookey Packing Co., 649 F.2d 552, 554 (8th Cir.1981)
 
 
 [7]
 Brief of appellants at 29. Appellants are referring to Kenyatta v. Bookey Packing Co., 649 F.2d 552 (8th Cir.1981)