Cecil M. HAGANS

v.

The BUDD COMPANY.

Civ. A. No. 81–3977.

United States District Court, E.D. Pennsylvania.

Sept. 29, 1984.

Judith B. Chomsky, Philadelphia, Pa., for plaintiff.

Carter R. Buller, Carol A. Mager, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for The Budd Co.

Paula R. Markowitz, Philadelphia, Pa., for Local Union No. 813.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHAPIRO, District Judge.

### FINDINGS OF FACT

1. Plaintiff, Cecil M. Hagans ("Plaintiff") is a black male citizen of the United States and is a resident of Philadelphia County, Pennsylvania.

2. Defendant, The Budd Company ("Budd") is a corporation doing business in Pennsylvania.

3. Plaintiff was employed at Budd's Hunting Park facility from November 30, 1964, until his discharge on March 23, 1981.

4. Plaintiff was a member of the bargaining unit represented by defendant, United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 813 ("Union") at all times material hereto.

5. On March 23, 1981, as a result of plaintiff's bid for the position, he began working as a General Rigger under the direction of Supervisor Gary Mulqueeney ("Mulqueeney").

6. Although plaintiff had worked as a rigger on previous occasions, he was unfamiliar with the rigger's job in the R-Building to which he was assigned.

7. After bidding for the General Rigger position, Hagans successfully passed the required test involving the use of a twenty ton lift truck.

8. After plaintiff successfully completed the test, Mulqueeney told plaintiff to meet him in the office.

9. In the office, Mulqueeney gave plaintiff documents and instructed him to look at the runs on the board, and told plaintiff that he was going to the bathroom and would be right back.

10. Plaintiff attempted to look at the runs in Mulqueeney's absence, but was unable to understand how to perform the job because he never had done so before.

11. Plaintiff left the office during Mulqueeney's absence to look at the coded numbers on the board.

12. Mulqueeney returned from the bathroom, found plaintiff out of the office, and asked him what he was doing. Plaintiff stated that he was not familiar with his assignment, and was not able to perform it.

13. Plaintiff and Mulqueeney then began shouting at each other. At some point, plaintiff was told to "shut up" by Mulqueeney.

14. Plaintiff then struck Mulqueeney in the face at least twice. Mulqueeney grabbed plaintiff between the waist and legs to avoid getting punched in the face. Mulqueeney grabbed plaintiff's shirt but never struck plaintiff.

15. Plaintiff stopped striking Mulqueeney when he heard someone say, "He's got enough." Mulqueeney then slid to the floor.

16. As a result of the blows inflicted by plaintiff, Mulqueeney was injured. He was bleeding from both nostrils, there was tenderness of the nose, abrasions, contusions and hematoma of the periorbital re-

gions of both eyes. Mulqueeney also suffered a fracture of the orbit flow with herniation of the tissues into the orbit. There was also a tenderness of the forehead and both orbits. Mulqueeney received medical attention from Budd's physician, a local hospital, and an ophthalmic surgeon.

17. Portions of the altercation were witnessed by an employee, James Werts ("Werts") who was operating machinery at the time. Werts continued performing his job during the altercation involving plaintiff and Mulqueeney.

18. Plaintiff was recommended for discharge by Supervisor Mulqueeney for violating Budd Company Rules 5 and 14.

19. Rule 5 provides that an employee who fights or commits any acts of violence on company property is subject to immediate discharge.

20. Rule 14 provides that an employee who threatens, intimidates or interferes with fellow employees or supervisors is subject to progressive discipline, up to and including discharge.

21. Representatives of the Union promptly investigated the incident between plaintiff and his supervisor.

22. On the night of the altercation, a departmental mini-hearing was conducted pursuant to standard practices at Budd's Hunting Park facility. Plaintiff was represented by shop steward Crowley. Plaintiff did not raise the issue of race discrimination at the mini-hearing.

23. On March 17, 1981, a Disciplinary Control Board ("DCB") hearing was held to consider the recommended discharge. Hagans was present and was represented by union officials; Supervisor Mulqueeney was also present. Both plaintiff and Mulqueeney testified concerning the incident.

24. At the DCB hearing, Mulqueeney admitted shouting at plaintiff and telling him to shut up.

25. At the DCB hearing, the Union stated that it had witnesses but did not call Werts to testify.

26. Budd does not permit the Union to call witnesses to testify at DCB hearings held at the Hunting Park facility.

27. Plaintiff did not state at the DCB hearing that he believed he was being discharged because he was black. Rather, he stated that he was being discharged because his supervisor was seriously injured and he was not. (Defendant's Exhibit 23, p. 12)

28. Plaintiff did not state at the DCB hearing that Mulqueeney struck the first blow. Rather, he stated that after Mulqueeney told him to shut up, he did not remember what happened next.

29. As a result of the DCB hearing held on March 27, 1981, the recommended discharge of plaintiff was upheld.

30. The Union filed a grievance contesting plaintiff's discharge.

31. Various Union officials met with plaintiff on a number of occasions, both at the Union Hall and at plaintiff's home, to investigate the grievance and prepare for arbitration.

32. During the meeting at the Union Hall, plaintiff was asked to tell his story. Plaintiff did not state that race was a factor in his discharge.

33. In preparation for his arbitration, plaintiff met with the Grievance Committee Chairman, Andy Palumbo, and International Representative Reed. Plaintiff presented Reed and Palumbo with a written statement of his views in which plaintiff mentioned that the incident was "between people not of the same color." (Defendant's Exhibit 16).

34. Pursuant to the Collective Bargaining Agreement between Budd and the Union, the matter proceeded to binding arbitration before the impartial permanent Arbitrator, Louis A. Crane. The Union and Budd had agreed upon a permanent arbitrator because such an arbitrator is familiar with the workplace and the practices of Budd and the Union.

35. Plaintiff was represented at the arbitration by Anthony Reed ("Reed"), International Representative of the United Auto

Workers. Reed interviewed plaintiff prior to the day of the arbitration proceeding. Plaintiff did not inform Reed that he believed that race was a factor in his discharge or that he wanted the Union to so claim.

36. At the arbitration, plaintiff and Mulqueeney both testified and were subject to cross examination. Plaintiff mentioned nothing in his testimony about Mulqueeney striking him. Neither plaintiff nor the Union stated that race played a factor in plaintiff's discharge. Plaintiff did not testify that he was struck by Mulqueeney. Werts also testified.

37. On July 1, 1981, Arbitrator Crane issued an Opinion and Award upholding the discharge of plaintiff.

38. Arbitrator Crane found that "Hagans was the only one who struck any blows." (Opinion p. 4) He further determined that "it is apparent that Mulqueeney suffered a beating at Hagans' hands." (*Id.*)

39. Arbitrator Crane determined that the beating which plaintiff inflicted upon Mulqueeney justified plaintiff's discharge because it could impair supervisors' ability to direct the work force:

Hagans probably was provoked at Mulqueeney, but that did not justify in any way, shape or form the beating he administered. He did more than strike a blow in the heat of anger. He continued to hit Mulqueeney in the face and on top of the head, until a bystander had told him that Mulqueeney had had enough. This is misconduct so serious that it goes beyond the bounds of corrective discipline. Neither Hagans' length of service nor his prior record can mitigate against the seriousness of his offense. One such offense, which could impair the ability of supervision to direct the working force, is enough.

For the reasons stated, discharge is not too severe a penalty and Hagans' discharge should therefore stand.

40. On November 23, 1981, plaintiff signed an affidavit stating that he did not remember whether or not Mulqueeney hit him. (Defendant's Exhibit 6, ¶ 6)

41. Plaintiff filed a timely charge against defendants with the EEOC.

42. There is no evidence that white Union employees at Budd's Hunting Park facility similarly situated to plaintiff were not discharged for similar conduct.

43. The only other altercation between a supervisor and an employee where blows were exchanged was that of Senigo and Delowery, both of whom are white. The fight between employee Senigo and supervisor Delowery was not of a comparable seriousness. The supervisor was the aggressor and beat the employee; the supervisor was not injured. Budd imposed a six week suspension on the supervisor who struck the employee. The employee was suspended for two weeks for fighting with a supervisor. (Defendant's Exhibit 31, p. 24) But the employee denied striking the supervisor and the matter proceeded to arbitration before permanent Arbitrator Crane. Arbitrator Crane reinstated the employee with back pay, on the ground that Budd failed to prove the employee had violated the rule against fighting. In this case, plaintiff was the aggressor and the only one who struck blows.

44. In light of the seriousness of plaintiff's conduct and the language of the Opinion and Award, there is no evidence that Arbitrator Crane would have reinstated plaintiff even if the Union had contended that race was a factor in the severity of the discipline imposed by Budd.

45. Budd treats fighting with supervisors more harshly than fights with fellow employees especially when the employee is the aggressor and the supervisor is more severely injured. The Union has educated its members of this.

46. Plaintiff has failed to prove that any white employee engaged in comparable conduct without discharge.

47. Plaintiff has introduced no evidence of comparable altercations between a supervisor and an employee and has intro-

duced no direct evidence of discrimination by Budd against plaintiff.

48. Budd did not, in any way, discriminate against plaintiff on account of his race.

49. On this record, Budd did not engage in a pattern or practice of determining discipline on the basis of race.

50. Budd did not discharge plaintiff on the basis of either his race or Mulqueeney's race.

51. The Union's representation of plaintiff was not arbitrary, discriminatory or in bad faith and was within the range of acceptable performance.

52. The Union's decision not to claim that race was a factor in plaintiff's discharge at either the mini-hearing, the DCB hearing or the arbitration proceeding did not affect the outcome of the decisions made by Budd because of the seriousness of plaintiff's offense.

53. Plaintiff's case was heard and determined in accordance with the procedures of the Collective Bargaining Agreement.

## DISCUSSION

This action was brought pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000e for alleged racial discrimination. Plaintiff also claims that his Union, UAW Local 813, breached its duty of fair representation under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Defendant claims that plaintiff was discharged for fighting with a supervisor, a legitimate non-discriminatory reason.

Plaintiff had the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once a *prima facie* case has been shown, the burden shifts to defendant to articulate some non-discriminatory reason for the challenged action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *Lewis v. University of Pittsburgh*, 725 F.2d 910, 914 (3d Cir.1983).

If such a facility legitimate reason is proffered, plaintiff then bears the burden of demonstrating that the reason given by defendant is merely a pretext. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs*, 450 U.S. at 253, 101 S.Ct. at 1093.

In order to establish a *prima facie* case of discriminatory discharge, plaintiff must establish (1) that he is a member of a protected class; (2) that he was the object of adverse action; and (3) that such adverse action occurred because of his race. *Rivers v. Westinghouse Electric Corp.*, 451 F.Supp. 44, 47–48 (E.D.Pa.1978).

Plaintiff sought to establish a *prima facie* case by showing that he belonged to a racial minority, that he was provoked into a fight by his supervisor and that when he was discharged as a consequence, he was treated more harshly than other white employees charged with engaging in violence with a supervisor.

Plaintiff would have to show a white employee engaged in a fight of "comparable seriousness" with his own to establish a similar situation. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Worthy v. U.S. Steel Corp.*, 616 F.2d 698, 702 (3d Cir.1980). Plaintiff bears the burden of proving the similarity between his conduct and that of white employees disciplined less severely. *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 603 (8th Cir.1983). In the present case, plaintiff failed to prove that he was treated differently from white employees charged with beating supervisors. Plaintiff introduced no evidence that any white employee engaged in conduct comparable to plaintiff's and was not discharged. Several incidents referred to by plaintiff involved white employees who fought with other employees rather than with supervisors. Fighting with an employee is not comparable to fighting with a supervisor because the latter conduct significantly un-

dermines management's ability to direct the activities of the workforce effectively.

Whenever a white employee was involved in an altercation with a supervisor, the incident was of a much less serious nature than this. No incident involved the kind of physical violence inflicted upon a supervisor that is involved here. In the incident between Senigo and Delowery, the only other altercation between an employee and a supervisor where blows were exchanged, the supervisor was the aggressor, and was not injured.

In addition to the specific incidents introduced at trial, plaintiff has argued that there is a significant statistical disparity between the discipline imposed on black and white employees. This argument is rejected for a number of reasons. First, statistical evidence was never offered at trial; hence, defendant was deprived of the right to cross-examine plaintiff regarding plaintiff's methodology, conclusions, or the propriety of the use of the binomial model that plaintiff has used. Moreover, there is no evidence that the cases of termination used in the analysis are sufficiently comparable to the present case to justify statistical comparison for purposes of proving disparate treatment. Finally, plaintiff has failed to use a sample size large enough to be statistically significant. Because plaintiff has failed to introduce any evidence that black employees were disciplined more harshly than white employees who fought with supervisors, plaintiff has failed to establish a *prima facie* case.

Even if plaintiff makes out a *prima facie* case, defendant's burden is not one of proof but rather of coming forward with evidence that the action was taken for a legitimate non-discriminatory reason. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *U.S. Postal Service Board of Governors v. Aikens,* 453 U.S. 902, 101 S.Ct. 3135, 69 L.Ed.2d 989 (1983).

█ Viewing the record as a whole, it is clear that plaintiff has not met his burden.

Budd was able to articulate a legitimate non-discriminatory reason for plaintiff's discharge, that of maintaining management's ability to direct the workforce effectively. It seems to have been the company's policy to discipline employees who beat and injured their supervisors more harshly than employees who fought with supervisors and lost. Supervisor Mulqueeney's testimony that he remained patient with plaintiff at all times and was not provocative is not as credible as plaintiff's testimony that he was unhelpful and abrupt. But the fact that Mulqueeney may have provoked plaintiff when he was confused and uncertain about his new assignment cannot excuse plaintiff's behavior. Even if the incident occurred exactly as plaintiff described it, the company had the right to discharge the plaintiff. Although Supervisor Mulqueeney's treatment of one newly assigned to his group cannot be characterized as exemplary, and Budd might do well to consider instructing its supervisors in techniques of leadership and orientation of employees in new positions, the Budd Company nevertheless has a legitimate interest in protecting management from acts of violence.

Perhaps plaintiff would not have been discharged if he had not injured Mulqueeney or Mulqueeney had injured him. But Hagans gained the advantage in the fight and stopped hitting Mulqueeney only when urged by others to desist; he must suffer the consequences. One may question the wisdom of a policy that treated employees who fought with supervisors and injured them more harshly than those who were injured by the supervisors, but there was no evidence to show that such a policy was motivated by racial discrimination. Therefore, plaintiff cannot prevail on his claim under Title VII.

█ The elements of a cause of action under 42 U.S.C. § 1981 are substantially identical to those of Title VII. *See Goodman v. Lukens Steel Co.,* 580 F.Supp. 1114 at 1121 (E.D.Pa.1984); *Pouncy v. Prudential Insurance Co. of America,* 668 F.2d 795, 797 n. 3 (5th Cir.1982); *Becton v.*

*Detroit Terminal*, 687 F.2d 140, 141 (6th Cir.1982). Plaintiff's claim under 42 U.S.C. § 1981 also fails for lack of proof of racial discrimination in the discipline imposed on the plaintiff.

Plaintiff also alleges that his union, UAW Local 813, breached its duty of fair representation under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. Generally, an employee may not bring an action under § 301 of the Labor Management Relations Act where the Collective Bargaining Agreement contains a provision requiring grievance and arbitration of disputes arising under the agreement. However, an employee may bring an action against his union and/or employer if the employee can prove the union breached its duty of fair representation in handling the employee's grievance. *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

"[A] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith ... a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory manner." *Vaca*, 386 U.S. at 190–191, 87 S.Ct. at 916–917. While it is not always clear when a union has acted in breach of its duty of fair representation, "[m]ere ineptitude or negligence in the presentation of a grievance by a union has almost uniformly been rejected as the type of conduct intended to be included within the term 'perfunctory.'" *Findley v. Jones Motor Freight, Etc.*, 639 F.2d 953, 960 n. 2 (3d Cir.1981). "What is required is a showing of actual bad faith or arbitrary conduct." *Riley v. Letter Carriers Local No. 380*, 668 F.2d 224, 228 (3d Cir.1981). The union breach must have "seriously undermined the integrity of the arbitral process." *Hines v. Anchor Motor Freight*, 424 U.S. 554, 567, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1967). Not only must the Union's representation not have been within the range of acceptable performance, but the deficient performance must have affected

the arbitrator's decision in some manner. *Findley*, 639 F.2d at 958.

Plaintiff asserts that the union breached its duty of fair representation in three respects: (1) it failed to call James Werts as a witness at the DCB hearing; (2) it did not present evidence of Supervisor Mulqueeney's reputation for having an unpleasant disposition; and (3) it failed to allege that plaintiff's discharge was racially discriminatory. Plaintiff has not demonstrated that these inactions constituted inadequate representation or that they affected the outcome of the arbitration in any material manner.

Failure to offer a witness might establish inadequate representation in some circumstances. Here, the failure to call James Werts at the company's DCB hearing did not damage plaintiff's presentation. Even if the Union had attempted to call Werts as a witness, it is unlikely that he would have been permitted to testify, because Budd has not allowed the Union to call third party witnesses to testify at DCB hearings held at the Hunting Park facility. Even if Werts had witnessed the entire incident and his testimony that Mulqueeney had grabbed plaintiff's shirt had been credited, it is unlikely the outcome of the DCB hearing would have been different. Plaintiff would have been discharged whether or not the fight had been provoked by Mulqueeney because of the severity of the injuries he inflicted upon Mulqueeney. Werts did testify at the arbitration hearing and the arbitrator still found for the company. Similarly, the Union's failure to present evidence of Mulqueeney's nasty disposition did not affect the outcome of the DCB hearing or the arbitration.

Plaintiff is complaining now that the Union did not allege racial discrimination as a basis for the discharge; however, plaintiff barely referred to race in discussing his defense with union officials. Plaintiff did not claim his discharge was on racial grounds until after the arbitration proceeding had been concluded by an adverse decision. Even if plaintiff had raised such a claim, it was within the union's range of

discretion to reject the claim if it determined that it was groundless. *Tate v. Weyerhaeuser,* 723 F.2d 598 (8th Cir.1983). The union was justified in determining that a claim of racial discrimination was not warranted. Plaintiff has not sustained his burden of proving that the union's failure to raise the issue of discrimination affected the outcome of the arbitration.

Finally, plaintiff has failed to produce evidence that the union displayed animosity towards him. Palumbo and the union did an effective job of handling plaintiff's grievance under the circumstances. The union did not breach its duty of fair representation.

In reaching these conclusions, the arbitrator's decision was admitted into evidence and accorded some weight, but the arbitrator's findings have not been deemed conclusive. The Supreme Court has stated, "the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance arbitration clause of a Collective Bargaining Agreement and his cause of action under Title VII . . . . The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Alexander v. Gardner-Denver Company,* 415 U.S. 36, 59–60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974). It is within the court's discretion to determine the weight to be accorded an arbitral decision. "Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight." *Id.* at 60 n. 21, 94 S.Ct. at 1025 n. 21.

Here, the issue of racial discrimination was never raised at the arbitration so the decision of the arbitrator could not be given any weight on that issue. The court has independently reviewed the facts and conclusions reached by the arbitrator and considered plaintiff's claims *de novo.* Because plaintiff has been unable to prove racial discrimination by the company or a breach of the duty of fair representation by the union, defendants are entitled to judgment in their favor.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and subject matter.

2. Budd is an employer within the meaning of 42 U.S.C. § 2000e(b) and 29 U.S.C. § 185(b).

3. The Union is a labor organization within the meaning of 42 U.S.C. § 2000e(d) and 29 U.S.C. § 185(b).

4. Plaintiff has failed to prove a violation of Title VII.

5. Budd has not violated 42 U.S.C. § 1981.

6. The conduct of the Union in the instant case was adequate and within the realm of acceptable performance at the mini-hearing, the DCB hearing and the arbitration. *Findley v. Jones Motor Freight,* 639 F.2d 953 (3d Cir.1981).

7. The Union processed plaintiff's grievance fully and fairly without offering evidence of race discrimination or other conduct of his supervisor. Plaintiff was discharged for beating his supervisor which is a valid, non-discriminatory reason. *See Coleman v. General Motors Corp.,* 667 F.2d 704 (8th Cir.1981).

8. Even if certain actions of the Union were arguably deficient, there is no reason to believe that these actions tainted the decision or affected the outcome of the arbitration. *Bazarte v. United Transportation Union,* 429 F.2d 868 (3d Cir.1970).

9. The Union undertook and pursued plaintiff's grievance in good faith and the Union did not breach its duty of fair representation.

10. Plaintiff has failed to establish either that Budd breached the Collective Bargaining Agreement or the Union breached its duty of fair representation and has therefore not proven a § 301 violation.

11. Judgment shall be entered in favor of Budd and the Union.