Raymond T. PACHICK, Plaintiff,

v.

FRIEDMAN'S EXPRESS, INC., Daniel Friedman, Joseph T. Forgach, Teamsters Local Union No. 401 and Francis Belusko, Defendants.

Civ. No. 85–0741.

United States District Court,
M.D. Pennsylvania,
Third Circuit.

Aug. 29, 1986.

Ralph E. Kates, III, Francis G. Wenzel, Jr., Wilkes-Barre, Pa., for plaintiff.

Charles D. McCormick, Wilkes-Barre, Pa., Hugh J. Beins, Washington, D.C., for Teamsters #401 & Belusko.

Charles R. Pedri, Laputka, Bayless, Ecker & Cohn, P.C., Hazleton, Pa., for Joseph Forgach.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### Procedural History

This matter is before the court by way of defendants' Motion for Summary Judgment filed pursuant to Fed.R.Civ.P. 56.

On May 30, 1985, plaintiff filed a complaint naming as defendants Friedman's Express, Inc. (Friedman's), Daniel Friedman, President, Joseph R. Forgach, Director of Safety and Personnel, Teamsters Local Union No. 401 (Union) and Francis Belusko, President and Business Agent for the Union. The complaint alleges eight causes of action all of which arise from Friedman's dismissal of plaintiff and the Union's subsequent efforts to have him reinstated.[1]

On December 6, 1985, the defendants filed a Motion for Summary Judgment. On the same day, the defendants filed supporting briefs.[2] On January 21, 1986, plaintiff filed a memorandum of law in opposition to

---

1. The eighth count of the complaint states a cause of action for alleged civil rights violations. The plaintiff has voluntarily withdrawn this claim. *See* Document 42 of the Record at 27.

2. The Union and Belusko are represented by counsel separate from the other defendants. Each set of defendants filed a Motion for Summary Judgment and supporting brief on December 6, 1985. The basis of each motion is substantially similar and this opinion will collectively refer to the "defendants" except where stated. The arguments advanced on behalf of the Union and Belusko will be referred to as those of the Union.

the Motion for Summary Judgment filed by the Union. On January 31, 1986, plaintiff filed a memorandum of law in opposition to the Motion for Summary Judgment filed by Friedman's, Daniel Friedman and Joseph Forgach. The Union filed a reply brief on February 10, 1986 and the remaining defendants filed a reply brief on February 28, 1986. On March 7, 1986, plaintiff filed a brief in response to the reply brief submitted on behalf of the Union.

On March 31, 1986, this court issued a Memorandum and Order directing the plaintiff to respond to defendants' Statement of Material Facts. Plaintiff filed a response on April 21, 1986. By letter dated May 12, 1986, the Union requested that oral argument be scheduled on defendants' Motion for Summary Judgment. The court heard argument on June 12, 1986. During argument the defendants challenged several factual allegations contained in plaintiff's opposition brief. Plaintiff requested an opportunity to provide record citations for the contested allegations and, further, to respond to questions raised by the court.

By letter dated July 14, 1986 plaintiff requested an additional one week to ten days to supply the court with the promised information. On August 6, 1986 the plaintiff had failed to submit any material and the court issued an Order allowing plaintiff until August 15, 1986 to provide the court with any additional information he desired. By letter brief dated August 15, 1986 plaintiff responded to questions raised at argument and provided record citations to support the contested factual assertions. The court has considered these additional documents and this matter is now ripe for disposition. For the reasons set forth below, the court will grant defendants' Motion for Summary Judgment.

### Factual Background

A complete summary of the factual background is necessary for the resolution of defendants' motions.

The plaintiff, Raymond T. Pachick, commenced employment as a truck driver with Defendant Friedman's Express, Inc. in 1968. Plaintiff's Statement of Material Facts ¶ 3, Document 70 of the Record; ¶ 9 of Complaint, Document 1 of the Record. On September 19, 1984, while in the course of his employment, plaintiff was involved in a single vehicle traffic accident while driving in New York City. On the same day, plaintiff was suspended by Friedman's pending an investigation into the accident. Union's Statement of Material Facts ¶ 10, Document 26 of the Record; Plaintiff's Statement of Material Facts ¶ 10, Document 70 of the Record. Friedman's discharged plaintiff from his employment on December 12, 1984. Union's Statement of Material Facts ¶ 17, Plaintiff's Statement of Material Facts ¶ 17.

The plaintiff was discharged for a violation of Article 44 of the National Master Freight Agreement. This article, in pertinent part, states:

> The Employer shall not discharge nor suspend any employee without just cause but in respect to discharge or suspension shall give at least one (1) warning notice of the complaint against such employee to the employee, in writing, except that no warning notice need be given to any employee before he is discharged if the cause of such discharge is dishonesty, proven theft ... recklessness resulting in a serious accident while on duty....

Exhibit 40 of Document 53 of the Record.

Mr. Joseph Forgach, Director of Safety and Personnel at Friedman's, testified that he was responsible for the decision to discharge Pachick for recklessness resulting in a serious accident while on duty. Deposition of Joseph Forgach, Document 33 of the Record at 53. [Forgach Deposition] Forgach explained that it is his policy to automatically terminate a driver whose recklessness causes a "single vehicle roll over" where the damage exceeds $10,000. This has been Friedman's policy since 1969. *Id.* at 14, 53–4; *See* Employer Exhibit A(1), Document 27 of the Record.

### The Accident

At deposition, plaintiff described the factual circumstances surrounding the acci-

dent.[3] Pachick testified he left the Maspeth terminal at approximately 3:00 A.M., Deposition of Raymond Pachick, Document 49 of the Record at 49. [Pachick Deposition] Plaintiff described the weather conditions as "good" and "clear" and stated that the road surface was dry. *Id.* at 54. While traveling in the far right lane on the Cross Bronx Expressway, plaintiff approached a point where local traffic merges with expressway traffic. As a courtesy towards drivers entering the expressway and as a safety precaution, plaintiff moved to the center lane. *Id.* at 52. Plaintiff testified that he went over a "bump" or depression in the road and heard what he described as a "clunking noise." *Id.* at 49. Immediately after plaintiff heard this noise, the steering wheel turned freely and plaintiff lost control of the vehicle. *Id.* at 57. The tractor trailer veered to the left, struck the concrete divider and knocked down two light fixtures. Pachick Deposition at 86–89, Document 48 of the Record. The entire vehicle rolled over and landed on its side. Statement of Ronald Cruiz, Exhibit 8(68) of Document 53 of the Record. The plaintiff was able to exit the truck by climbing through an open space created when the windshield cracked and fell out. Pachick Deposition at 88, Document 48 of the Record. After the plaintiff had alighted from the vehicle, fuel which had spilled onto the road ignited and part of the trailer became engulfed in flames. *Id.*, Exhibit 8(4) of Document 53 of the Record. Joseph McKeever, who was operating a tractor trailer behind plaintiff, pulled his vehicle over at the accident site and was able to contain the fire with a fire extinguisher. Within minutes, the New York City Fire and Police Departments arrived and extinguished the fire. Pachick Deposition at 88, Document 48 of the Record; Testimony of Joseph McKeever before Joint Committee Hearing at 22, Document 28 of the Record; Statement of Joseph McKeever, Exhibit 8(10) of Document 53 of the Record.

Mr. Pachick was not seriously injured but was unable to return to work until December 12, 1984. Exhibit 7(22) of Document 53 of the Record. The monetary loss Friedman's incurred as a result of the accident was approximately $34,000.[4] Union's Statement of Material Facts ¶ 31; Forgach Deposition at 5, 85–6; Exhibit 8(5) of Document 53 of the Record.

According to plaintiff, while still at the accident scene an individual, who plaintiff described only a Fire Chief, stated that he believed the cause of the accident was a broken spring. The men then examined the spring and observed that it was broken in two different spots. The Chief was quoted by plaintiff as stating that the spring was broken in one spot prior to the accident.[5] Pachick Deposition at 96, Document 48 of the Record.

The Fire Chief also examined the brakes on Pachick's vehicle and stated that they were not working properly. Pachick then pointed out the defects in the brakes and springs to McKeever. *Id.*

*The Union's Investigation*

As stated above, plaintiff was immediately suspended by Friedman's pending an investigation into the cause of the accident. After plaintiff received the notice of suspension, he and Defendant Belusko commenced an investigation of the accident. Pachick Deposition at 73–5, Document 48 of the Record.

Several weeks after the accident, Belusko and Pachick traveled to New York City for the purpose of obtaining statements and evidence which would demonstrate that Pachick was not responsible for the acci-

---

**3.** Plaintiff's deposition was taken on August 28, 29 and October 31, 1985 and is contained in four separate volumes. The pages are not numbered consecutively and each volume has a document number.

**4.** Plaintiff's response to the Union's Statement of Material Facts alleges that the monetary damage amounted to only $29,500. Plaintiff's Statement of Material Facts ¶ 31, Document 70 of the Record. As support for this contention plaintiff states that Friedman's counter claim, which has since been withdrawn, alleged damage of $29,-500. The exact figure is not material to the court's decision to grant summary judgment.

**5.** The complete mechanical significance of the spring does not appear in the Record. Apparently, it is plaintiff's contention that a faulty spring caused him to lose control of the vehicle.

dent.[6]  *Id.* at 75.  Deposition of Francis Belusko, Document 56 of the Record at 168 [Belusko Deposition] Belusko drove and arrived at Pachick's house at 7:00 A.M.  Pachick Deposition at 80, Document 48 of the Record; Belusko Deposition at 169.

Upon arriving in New York City, the two men went to the police station from which the accident investigation was conducted. They attempted to contact Officer Michael Murphy who was responsible for preparing the accident report.  Pachick Deposition at 75, Document 48 of the Record.  Belusko Deposition at 169.  Officer Murphy proved to be unavailable throughout the day and a message was left for him to call the Union Hall and reverse the charges.  *Id.* at 173; Pachick Deposition at 78, Document 48 of the Record.

While at the police station a copy of the police report pertaining to the accident was requested.  Belusko and Pachick were informed that such a request must be in writing and mailed to a specific address. Belusko Deposition at 170, Pachick Deposition at 76, Document 48 of the Record. Belusko ultimately obtained a copy of the police report prepared by Officer Murphy. Union Exhibit A(1), Document 27 of the Record.

After leaving the police station, Belusko and Pachick then attempted to locate the Fire Chief who allegedly attributed the cause of the accident to mechanical defects. This required Belusko and Pachick to visit three different fire houses before they were successful in locating the correct individual.  Belusko Deposition at 170–71; Pachick Deposition at 76, Document 48 of the Record.  Both men testified at deposition that the Fire Chief refused to provide them with any relevant information concerning the mechanical condition of the truck.  The Chief explained that city policy precluded him from testifying or providing a sworn statement.  Belusko Deposition at 174–77; Pachick Deposition at 77, Document 48 fo the Record.  The record does not disclose any further effort to secure the testimony of the Fire Chief.

Pachick and Belusko also visited the two towing stations that were called to the accident scene.  Belusko Deposition at 176, Pachick Deposition at 79, Document 48 of the Record.  The first station could not provide relevant information but referred them to Baker's Towing Service.  An individual at Baker's told them that any information concerning their part in the accident would be released only to Friedman's.  Pachick Deposition at 79, Document 48 of the Record; Belusko Deposition at 178.  The two men then left New York and arrived back at the Union Hall at approximately 7:00 P.M.  Belusko Deposition at 173; Pachick Deposition at 35, Document 50 of the Record; plaintiff's Statement of Material Facts, ¶ 14.

While Belusko and Pachick were at the Union Hall they received a telephone call from Officer Murphy.[7]  Both men talked with Murphy and he stated that all he knew about the accident was contained in the police report which he had prepared. Belusko stated at deposition that he did not take Murphy's statement, or question him extensively, because the officer stated all the information he knew about the accident was contained in the report.  Belusko Deposition at 180–2; Pachick Deposition at 35 of Document 50 of the Record, and at 78 of Document 48 of the Record.

Both Pachick and Belusko apparently were concerned that the towing service might have repaired the alleged mechanical defects in the truck before the Union would have a chance to document the same.  Pachick Deposition at 79, Document 48 of the Record.  Belusko testified that he called

---

6.  The exact date of the trip to New York City is unclear.  The Union claims the trip occurred on October 14, 1984.  Union's Statement of Material Facts, ¶ 14.  The plaintiff contends that the date of the trip was October 5, 1984.  Plaintiff's Statement of Material Facts, ¶ 14.  It is clear that plaintiff and Belusko made only one trip together to New York City for the purpose of investigating the accident.

7.  At deposition, Pachick testified that he could not be certain if Murphy called the Union Hall or if he called Murphy.  Pachick Deposition at 35, Document 50 of the Record.  It is clear that both Pachick and Belusko talked with Officer Murphy concerning this accident.

Joseph Forgach the day he returned from New York City and asked if Baker's Towing Service had made any repairs to the truck. Forgach assured Belusko that Baker's had not made any repairs to the truck. Belusko Deposition at 179–80.

Belusko and Pachick also went to examine the truck after it was returned to Friedman's.[8] After Belusko made a visual inspection of the truck he asked the mechanic, Thomas Martin, if any work was performed on the vehicle by the towing station. Martin stated that no repairs were made and, in fact, a second mechanic, Robert Morris, was able to steer the tractor off the "flatbed." Because Morris was able to steer the vehicle, Belusko asked if any repairs could have been made to the steering box. Morris stated that, in his opinion, the steering box had not been repaired. Belusko Deposition at 185–90; 204; Deposition of Anthony Mussoline at 9–10, Document 35 of the Record.

While Belusko was inspecting the vehicle he noticed steel shaving in the vicinity of the steering box and, also, noticed that the spring had been removed. Belusko did not place any significance on the steel shavings because the mechanic told him the steering box had not been repaired. Belusko also telephoned Joseph Forgach and asked if he knew what happened to to the spring. Forgach explained that it was sent to the Ford Motor Company for testing because plaintiff had identified it as a major cause of the accident. Belusko Deposition at 191–94, see Exhibit 7(42) of Document 53 of the Record. Belusko never personally examined the spring. Belusko Deposition at 197. Belusko also never attempted to contact Ford to learn the results of any testing performed on the spring. Id. at 194.

On numerous occasions Belusko discussed plaintiff's accident with Joseph McKeever. These discussions centered around what McKeever observed the night of the accident.[9] Belusko Deposition at 157–67. These discussions were had via telephone and the men never personally met until the day of the hearing before the Joint Committee. Id. at 160. Plaintiff has submitted as an exhibit a copy of the Union's telephone bill for the period between the accident and the hearing. The telephone bill reveals that the Union placed six calls to McKeever's home between October 5, 1984 and January 3, 1985. The Union was billed for a total of 39 minutes of conversation. See Exhibits 8(61–65) of Document 53 of the Record.

Prior to the hearing, three truck drivers who were members of Local 401, but employed by North Penn Express, approached Belusko. These individuals stated they all had experience driving a tractor similar to the one Pachick was operating on the night of the accident and all had experienced a steering defect. A signed sworn statement to this effect was obtained and introduced as evidence at the hearing before the Joint Committee. Pachick Deposition at 38–40 of Document 50 of the Record. Union's Exhibit A(2), Document 27 of the Record.

In December of 1984 Pachick went to New York City for a second time in order to obtain a statement from John Chicchetti. Belusko did not accompany Pachick on this trip. Chicchetti was employed as a supervisor at the Maspeth terminal and was working the night of the accident. Pachick stated that he wanted to obtain a statement from Chicchetti so that it would be available in the event Chicchetti was unable to testify before the Joint Committee. Chicchetti did not testify at the hearing and his statement was accepted into evidence. Pachick Deposition at 26–29, Document 50 of the Record. Plaintiff's Statement of Material Facts ¶ 22, Document 70 of the Record; Union's Statement of Material Facts ¶¶ 22,

---

**8.** The exact date of this inspection does not appear in the Record. However, Anthony Mussoline accompanied Pachick and Belusko and he recalls examining the truck in December of 1984. Deposition of Anthony Mussoline at 9–10, Document 35 of the Record. The material fact is that Belusko did examine the tractor and question the mechanics about any repair work.

**9.** There was also discussion concerning expenses for which McKeever would be reimbursed. The Union reimbursed McKeever for one day lost wages and travel expenses. The total reimbursement was $119.41. Exhibit 8(60) of Document 53 of the Record.

27, Document 26 of the Record; Union's Exhibit A(5), Document 27 of the Record.

The relevant portion of Chicchetti's statement is that the day before the accident a mechanic employed by Friedman's was requesting information about the vehicle plaintiff was operating the night of the accident. Chicchetti later realized this vehicle was involved in the accident and he asked the mechanic why he was curious about that particular tractor. The mechanic stated that it was low on oil but, upon further questioning, adamantly refused to answer any further questions.

As stated above, plaintiff was discharged from employment on December 12, 1984. On December 19, 1984, Pachick filed a grievance concerning his discharge. Paragraph 17 of the Complaint, Document 1 of the Record; Exhibit 8(78) of Document 53 of the Record.[10] On this same day, Pachick, Belusko and Union Shop Steward Zimmerman met with company representatives Joseph Forgach and Jack Richards. The purpose of this meeting was to discuss plaintiff's discharge. Union's Statement of Material Facts ¶ 18, Document 26 of the Record; Plaintiff's Statement of Material Facts ¶ 18, Document 70 of the Record; Pachick Deposition at 9, 45, Document 48 of the Record.

Immediately prior to this meeting, Belusko suggested that Pachick admit the accident was his fault and dismiss his grievance for back pay in exchange for reinstatement. Pachick responded that he would withdraw his claim for back pay but would not accept responsibility for the accident. Pachick Deposition at 45–46, Document 48 of the Record. In the course of this meeting, Belusko asked the company representatives if they were interested in a compromise. Jack Richards declined to enter into settlement negotiations stating that Friedman's intended to take the matter to the Joint Committee. Pachick Deposition at 48, Document 48 of the Record,

Plaintiff's Statement of Material Facts ¶ 18, Document 70 of the Record.

At this meeting, the company and the Union each discussed its respective theory of the cause of the accident. The Union claimed that the sole cause of the accident was faulty equipment. The company contended that Pachick was operating his vehicle at an excessive rate of speed and when the truck crossed over the depression in the road Pachick lost control and struck the concrete divider and light fixtures. Belusko Deposition at 143–45. The meeting lasted about one hour. Pachick Deposition at 46, Document 48 of the Record. This meeting was not required under the contract but was held at the request of Belusko. Belusko Deposition at 139.

Prior to the hearing before the Joint Committee, Belusko and Pachick met with Attorney John Moses and discussed plaintiff's grievance. Pachick Deposition at 71, Document 48 of the Record; Union's Statement of Material Facts ¶ 20, Document 26 of the Record; Plaintiff's Statement of Material Facts ¶ 20, Document 70 of the Record.

Belusko and Pachick also met on three separate occasions for the purpose of preparing a statement which would outline the Union's version of the accident and would be submitted to the Joint Committee. Pachick was not completely satisfied with the language contained in the first draft. The language was changed and the statement lengthened. Pachick Deposition at 5–10, Document 50 of the Record. In pertinent part, this statement alleged:

Mr. Pachick was en route from New York terminal to the Scranton terminal, with tractor # 852 and trailer # 1307, as he approached the intersection of the Sheriden Expressway he slowed down to about 35 MPH from 45 to 50 MPH for the upcoming bounce in the road. As soon as he crossed over the bounce he

**10.** Plaintiff's complaint states that the grievance was submitted on December 19, 1984. A copy of the actual grievance, submitted as an exhibit for the plaintiff, establishes that it was filed on December 19, 1984. Nevertheless, plaintiff's response to the Union's Statement of Material

Facts denies that plaintiff protested his grievance on December 19, 1984. Without citing to the Record, plaintiff nows argues that plaintiff filed his grievance on December 12, 1984. Plaintiff's Statement of Material Facts, ¶ 17, Document 70 of the Record.

heard the sound of metal breaking at this point ... the steering failed (Exhibit I). The steering wheel turned freely with no control of the vehical (sic) (Exhibit II). The left side of the tractor then dropped and the unit veered to the left, he then struck the divider.... The police came to the scene but the driver was not issued a citation. The state motor vehicle [department] inspected the unit and said they thought that the broken spring on the left side is what caused him to loose (sic) control of the vehicle and turn over, they also told him that the one brake on the tractor had not worked from the time the brake shoes were replaced, it was not working because the drum was completely rusted on the inside. They then told him that this was the 3rd accident in that exact same spot in the last two weeks, and over one hundred in less than a year.

Union's Exhibit A, Document 27 of the Record.

The plaintiff claims he met with Belusko on eight or nine occasions between the accident and the Joint Committee Hearing. Plaintiff contends he initiated most of these meetings. Plaintiff's Statement of Material Facts ¶ 13, Document 70 of the Record.

*Joint Committee Hearing*

On January 11, 1985, plaintiff's grievance was heard before the Central Pennsylvania Joint Area Grievance Committee. On January 16, 1985 the Joint Committee issued a decision upholding the discharge. The Joint Committee is comprised of a union and management representative from each of the eight companies in the Central Pennsylvania Area. The representative from the union and the company directly involved with the grievance are excluded from the panel. One company was not represented at the hearing. Consequently, a panel comprised of six union and six company representatives heard the merits of the case.[11] Pachick Deposition at 22,

Document 49 of the Record; Joint Committee Exhibit C of Document 27 of the Record.

Belusko represented plaintiff at the hearing while Joseph Forgach represented Friedman's. Forgach began his presentation by reading a statement which he had prepared. The statement made reference to 18 exhibits, all of which were presented to the Board. The presentation contained a general description of the accident, attempted to calculate the speed of plaintiff's vehicle and establish that the truck was in satisfactory mechanical condition.

The first exhibit was an accident investigation report prepared by Friedman's. This report noted that the highway where the accident occurred has a posted speed limit of 50 miles per hour and is well lighted. The report also stated that on the day of the accident the roadway was dry and there were no visibility restrictions. Employer's Exhibit A, Document 22 of the Record.

A substantial portion of the company's presentation was devoted to establishing the average speed of plaintiff's vehicle from the time he left the Maspeth terminal until the accident. The company attempted to do this by establishing the distance between the terminal and the accident site and the time plaintiff required to travel that distance.

The terminal's daily log for the day of the accident established that plaintiff started his trip at 2:55 A.M. An affidavit from the security guard responsible for maintaining this record also was introduced into evidence. The affidavit stated that the guard checked his watch for accuracy every day by calling a certain telephone number which apparently gives the correct time. Employer's Exhibits A(6) and A(7), Document 27 of the Record.

The time of the accident was estimated from two sources. First, an affidavit from John J. Ford stated that at 3:21 A.M. the

---

11. Plaintiff has advised the court that he is in the process of preparing interrogatories aimed at discovering the identity of the panel members. Apparently, plaintiff is requesting that the court refrain from deciding defendants' motion until these interrogatories are prepared and answered. The court is of the opinion that such information would not affect the result and should not cause any further delay in resolution of this matter.

New York City police received a call reporting the accident. While the affidavit is vague, the statement submitted by the company makes it clear that Ford was a private investigator hired by Friedman's. Ford spoke to a Sergeant Lotakis who told him that "the Sprint computer print out showed the call was received at 3:21 A.M." Employer's Exhibits A and A(9), Document 27 of the Record.

The second item relied upon was the tachometer disc from McKeever's truck.[12] This disc purports to show the speed of the vehicle at any given time. McKeever's tachometer shows that his truck came to a stop at 3:09 A.M. McKeever testified that he was travelling behind plaintiff for a distance of "[o]ne mile and a couple of tenths." Transcript of Hearing before Joint Committee at 27, Document 28 of the Record. During this distance McKeever stated that he was "gaining" on Pachick. Id. at 26, 33. Further, the tachometer shows that between 3:07 A.M. and 3:09 A.M. McKeever was travelling at approximately 65 M.P.H. The tachometer also reflects that the driver did not resume his trip again until 3:34 A.M. Affidavits also were introduced to attest to the accuracy of the tachometer and the fact that it was assigned to McKeever's truck. Employer's Exhibits 10–13, Document 27 of the Record.

Forgach argued that the panel should place the time of the accident at 3:09 A.M. Forgach also stated that it is 14.5 miles from the terminal gate to the accident scene and this entire distance, with the exception of two miles, consists of interstate highways.

On the basis of the above figures, Forgach argued that Pachick was traveling at an average speed of 62.1 miles per hour. "This means that he [Pachick] had to average 62.1 MPH, definitely too fast for the 50 MPH posted speed limit and the condition of the road." Forgach further contended that if plaintiff's time of the accident was accepted, it would mean that he was operating his vehicle an average speed of 21.7

miles per hour. Employer's Exhibit A, Document 27 of the Record.

The final segment of Friedman's presentation attempted to establish that the vehicle driven by plaintiff was maintained in a satisfactory mechanical manner.

Robert Morris, a first class mechanic employed by Friedman's, executed an affidavit which stated that on September 21, 1984, he was able to "back and steer tractor 852 off a roll back recovery vehicle at our Dorrance, Pennsylvania shop." The obvious import of this statement is that the steering mechanism was functional throughout the accident. Employer's Exhibit 14, Document 27 of the Record.

An affidavit from Mr. Ronald Galli, a first class mechanic employed by Friedman's, also was introduced into evidence. This affidavit, in pertinent part, states:

> On 9/28/84, I was assigned, along with Bob Rimshaw (No. 55), another first class mechanic, to check the steering on 852 tractor. Bob and I checked the draglink for play, the kingpins, the steering box and the tie rod ends and found every part to be operational with no malfunctions. We also saw the back spring shackle was pushed back as far as it could possibly go. The spring has two broken leafs on it. The breaks were jagged and irregular and were fresh breaks.

Employer's Exhibit 15, Document 27 of the Record.

A second affidavit from Galli stated that on September 6, 1984, he adjusted the brakes on the vehicle driven by plaintiff and "all brakes were in perfect working condition." Employer's Exhibit 16, Document 27 of the Record.

Forgach concluded his presentation by introducing a letter from the Ford Motor Company which stated that an evaluation was conducted on the spring which plaintiff identified to be a primary cause of the accident. This letter made the following points: (1) the spring was of good manufacture; (2) the spring was broken in two spots; (3) both breaks occurred at the same

12. Plaintiff's vehicle was not equipped with a tachometer.

time as a result of the vehicle striking a "discontinuity or object in the road surface." Employer's Exhibit 18, Document 27 of the Record.

Mr. Belusko began his presentation to the Joint Committee by reading the statement which he and plaintiff prepared. The statement may be summarized as follows.

Plaintiff was traveling at approximately 35 MPH when his vehicle crossed over the depression in the road. At this point he heard the sound of metal breaking and the steering failed. The accident report prepared by Officer Murphy reflects that plaintiff told police a steering failure caused the accident. The police did not issue a citation to plaintiff. Transcript of Hearing before Joint Committee at 15, Document 28 of the Record.

The presentation by Belusko also noted that an official from the State Motor Vehicle Department attributed the cause of the accident to a broken spring and defective brakes.[13] An individual from this department told Pachick that there are numerous accidents at this point in the road. *Id.* at 15–16.

A decision from the Pennsylvania Bureau of Employment Security granting unemployment compensation benefits to the plaintiff was also introduced into evidence by Belusko. This determination approved plaintiff's application for job benefits because there was no evidence to establish "that the claimant deliberately caused the accident which caused the truck to be demolished and sustain injury to himself." Union's Exhibit 4, Document 27 of the Record.

Belusko also introduced into evidence the affidavits executed by the three North Penn Drivers, Union's Exhibit A(2), Document 27 of the Record, and the affidavit of John Chicchetti. Union's Exhibit A(5), Document 27 of the Record.

An affidavit from Frank Foy, an employee of North East Express, also was introduced into evidence. This affidavit stated that Frank Foy and Steve Banas had occasion to examine over 100 used Ford tractors and, in their opinion, almost all of these tractors had defective springs. This affidavit was signed only by Frank Foy. Union's Exhibit A(7), Document 27 of the Record.

The last exhibit introduced was a single affidavit executed by seven drivers for Friedman's Express. In pertinent part, this affidavit stated: "We have been asked on numerous occasions to drive vehicles that are not road worthy, especially at foreign terminals that are to be brought back to the home terminal for repairs." Union's Exhibit A(8), Document 27 of the Record.[14]

Joseph McKeever was also called to testify on behalf of the plaintiff. The main portion of McKeever's testimony centered around the tachometer meter taken from his vehicle. McKeever testified that this tachometer was approximately five minutes slow. Transcript of Hearing before Joint Committee at 27, Document 28 of the Record. In response to this testimony, the Committee asked McKeever if he would then agree that the accident happened at 3:14 A.M., since his tachometer showed it was 3:09 A.M. when his vehicle came to a complete stop. McKeever testified that he still believed the accident happened at 3:30 A.M. but was unable to explain the discrepancy in time between the tachometer and his estimation. *Id.* at 27–29.

**13.** Plaintiff's story is that an official from the New York Motor Vehicle Department investigated the accident and pointed out the defective spring and brakes to the Fire Chief who, in turn, relayed the information to plaintiff. Transcript of Hearing before the Joint Committee at 40–41, Document 28 of the Record. Forgach argued that the Motor Vehicle Department was a fictitious unit fabricated by plaintiff. *Id.* at 37.

**14.** Plaintiff contends that this particular affidavit was not accepted into evidence during the phase of the hearing which the Chairman described as rebuttal. Belusko offered this affidavit and explained its contents to the panel members. The hearing Chairman voiced a concern that the affidavit was not proper rebuttal evidence. There was no objection to the admission of this affidavit. It is unclear whether it was considered by the Committee. In any event, it was presented to the Committee by Belusko. Transcript of Hearing before Joint Committee at 42–43, Document 28 of the Record.

## MERITS

Rule 56 of the Federal Rules of Civil Procedure provides that a trial court may enter summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on such a motion, the court is to resolve any issues of fact against the moving party. *Hollinger v. Wagner Mining Equipment Company,* 667 F.2d 402 (3d Cir.1981). "However, when there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Peterson v. Lehigh Valley Dist. Counsel,* 676 F.2d 81, 84 (3d Cir.1982). Rule 56(e) further provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

The defendants advance five arguments in support of their Motion for Summary Judgment. First, the Union did not breach its statutory duty of fair representation. Second, Friedman's did not breach the contract when it discharged plaintiff. Third, plaintiff's claim for vacation pay must be dismissed because he failed to exhaust available internal union remedies. Fourth, plaintiff's claim for defamation, intentional interference with contractual relationship and prospective contractual relationships, and intentional infliction of emotional distress must be dismissed as these claims are preempted by Federal Labor Law. Finally, defendants contend that plaintiff has failed to present any evidence to support his contention that defendants have committed a violation of Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401, *et seq.*

The court agrees that the Union did not breach its statutory duty of fair representation. The court also agrees with defendants' contention that plaintiff failed to exhaust the available internal union remedies in asserting his claim for vacation pay. Further, the court holds that the state law theories are preempted by Federal Labor Law and summary judgment is proper on defendants' cause of action based upon 29 U.S.C. § 401, *et seq.* The court will discuss each argument *seriatim.*

### Fair Representation

■ The duty of fair representation is imposed on labor unions because of their status as the exclusive bargaining representative for all employees in a given bargaining unit. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Peterson v. Kennedy,* 771 F.2d 1244 (9th Cir.1985); *Bazarte v. United Transportation Union,* 429 F.2d 868 (3d Cir.1970). A union breaches its duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes, supra,* 386 U.S. at 190, 87 S.Ct. at 916. A union is required "to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.* at 177, 87 S.Ct. at 910.

■ Mere proof that the union acted negligently or exercised poor judgment is insufficient to support plaintiff's claim of unfair representation. *Peterson v. Kennedy, supra; Findley v. Jones Motor Freight,* 639 F.2d 953 (3d Cir.1981); *Riley v. Letter Carriers Local No. 380,* 668 F.2d 224 (3d Cir.1981); *Bazarte v. United Transportation Union, supra; Bygott v. Leaseway Transportation Corporation,* 622 F.Supp. 774 (E.D.Pa.1985). The union's breach must seriously undermine the integrity of the arbitral process. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Hagans v. Budd Company,* 597 F.Supp. 89 (E.D.Pa.1984). Further, this "deficient performance must have affected the arbitrator's decision in some manner." *Id.* at 96.

The rationale for this standard was explained by our Court of Appeals in *Findley.*

The standard to be applied to union advocacy in grievance proceedings must be governed by the climate in which it functions. The perimeters of the minimally acceptable conduct cannot be too lax, or there will not be an appropriate safeguard for the union member whose important contractual rights are entrusted to and dependent upon the union's efforts in his behalf. On the other hand, to hold lay union representatives to the demanding tests applied to a trained trial lawyer would defeat the aims of informality and speedy resolution contemplated by labor-management grievance agreements.

*Id.* at 958.

Although each case must turn on its own particular facts, the following principles establish some general perimeters of the range of acceptable performance.

In *Findley,* the court characterized the union's performance as adequate.

However, the union's presentation of the grievance here cannot be characterized as 'perfunctory.' Plaintiff's claim was taken through every stage of the grievance procedure available under the contract. Two union representatives familiar with the claim presented it at each level. Plaintiff was present and testified at each proceeding ... and after each hearing, he expressed his satisfaction with the union representatives....

*Id.* at 960 (citations omitted).

In *Bygott v. Leaseway Transportation Corporation, supra* at 779, the court described the duty of the union in the following manner. "In order to comply with this duty to fairly represent its members, the union must research and consider the factual and legal principles underlying the grievance in a manner which is not arbitrary, discriminatory, or in bad faith."

In *Miller v. Gateway Transportation Company,* 616 F.2d 272 (7th Cir.1980), the Seventh Circuit reversed the district court's decision to grant summary judgment in favor of the union.

The present record does not exonerate the union under this standard. So far as appears, the union's representation consisted solely of a perfunctory reading of Miller's *pro se* written grievances. No effort was made to urge the absence of the warning letter predicate to Miller's eight-day suspension. No investigation was made into the incident involving the height of the truck that gave rise to that suspension; nor was any attempt made to find witnesses to that incident or to obtain relevant records relating thereto. The importance of that incident to the employer's right to discharge for the later misconduct seems not to have been noticed by the union representative. Faced with such a record, we cannot say Gateway has demonstrated the absence of any genuine issue as to any fact material to the question of fair representation.

*Id.* at 277 (footnote ommited); *see also Peterson v. Kennedy, supra* at 1253-4 (reviewing cases).

Perhaps the clearest statement of the union's responsibility in processing a grievance is contained in *Findley v. Jones Motor Freight, supra* at 961.

A union's representation must be made in good faith. It must be vigorous enough so that available opportunities to present the grievance are utilized, and sufficiently thorough so that the basic issues are presented in an understandable fashion. There must also be, however, due regard for the fact that both the advocates and the tribunal members are laymen, unlikely to be impressed by evidential nuances and cumulative testimony dear to the heart of trial advocates. If the panel had the essential facts before it, a decision adverse to the employee does not establish a breach of the duty of fair representation, even if a court would have come to a different conclusion in passing on the merits of the grievance.

The *Miller* court also held that the proper inquiry is "whether the union has made a full investigation, has given the grievant notice and an opportunity to participate, has mustered colorable arguments and has refuted insubstantial arguments by the em-

ployer." *Id.* at 277 (quoting R. Gorman, Labor Law at 718 (1976)).

■ With these principles set forth, the court holds that, as a matter of law, the record is insufficient to show that the union's effort was arbitrary, discriminatory, or in bad faith. Consequently, summary judgment is proper.

Belusko and Pachick developed a clear and credible theory of the cause of the accident and, through investigation, they attempted to document this theory. Less than one month after the accident Belusko and Pachick traveled to New York City and spent the day interviewing people who might have relevant information. The Fire Chief and individuals at two towing stations were interviewed. Upon their return, they spoke with the officer who prepared the police report of the accident. Belusko ultimately obtained a copy of this report.

Plaintiff admits that he and Belusko discussed the case on eight or nine occasions. Belusko also discussed the case with McKeever prior to the hearing.

Belusko also examined the tractor that plaintiff was operating. The mechanic told Belusko that he was able to steer the vehicle off the flatbed and, in his opinion, no repairs were made to the truck.

On three separate occasions Pachick and Belusko met for the purpose of preparing a statement which would be introduced into evidence at the hearing. This statement clearly alleged that Pachick was not speeding and the Fire Chief identified the cause of the accident as mechanical defects.

Prior to the hearing Belusko conferred with company representatives in order to discuss the merits of the case. At this meeting Belusko attempted to effectuate a settlement which would have allowed plaintiff to return to work. Finally, Belusko accompanied Pachick to the hearing. At this hearing, Belusko presented the union's theory of the cause of the accident, introduced numerous exhibits, and called Joseph McKeever as a witness.

At deposition, plaintiff testified that, with two exceptions, the union truthfully presented all the available evidence. Pachick Deposition at 42, Document 50 of the Record and, at 35 of Document 49 of the Record. Plaintiff believed that reporters for the New York newspapers and television stations covered the accident and took photographs and film of the scene. Pachick could not identify the newspapers or television stations but stated that the Union should have been able to discover this information. Plaintiff stated that the Union also should have made a complete investigation into the significance of the steel shavings found near the steering box. Pachick Deposition at 102–3, Document 48 of the Record.

Plaintiff was unable to articulate how the photographs or film clippings would have advanced his arguments. Assuming that this evidence was available, there is no showing that its absence would have affected the panel's decision. *See Hagans v. Budd Company, supra.* Further, the court is satisfied with Belusko's examination into the significance of the steel shavings.

At the conclusion of the hearing, plaintiff was asked if he was "properly represented" by the Union. Pachick gave the following response: "To the best of my knowledge. I feel that there are things that Red [Belusko] could have gotten into that he didn't." The plaintiff continued by stating that Belusko should have obtained the above mentioned photographs and film clippings. Transcript of Hearing before Joint Committee at 47, Document 28 of the Record. At deposition, plaintiff stated that Belusko was "the best of the worst" union representatives available to present his grievance. Pachick Deposition at 17–18, Document 50 of the Record.

Finally, the court notes that it is unimpressed with plaintiff's effort to establish that a conspiracy to blacklist him existed between the Union and Friedman's. There is not a scintilla of evidence to support such a contention or that plaintiff was discharged for any reason other than the accident. Pachick Deposition at 12, 48–9, 95, Document 48 of the Record; at 47, 64, 103 of Document 50 of the Record; Forgach Deposition at 5–15.

*Breach of Contract by Company*

█ Because plaintiff has failed to establish a cause of action against the Union his claim against Friedman's must also fail. To recover against Friedman's, it must be established that plaintiff "did not receive fair representation from the Union as well as proving his claim against the employer." *Findley v. Jones Motor Freight, supra* at 957 (citing *Vaca v. Sipes, supra*). "Thus, an employee's claim against his employer for wrongful discharge may be meritorious, but he nevertheless cannot prevail in a federal court action unless he establishes a lack of fair representation." *Findley v. Jones Motor Freight, supra* at 958. Because plaintiff has failed to establish a lack of fair representation from the Union, the court need not reach the merits of his claim against Friedman's.[15]

*Vacation Pay*

The second count of the complaint asserts a claim for $2,974.50, which is an amount equal to five weeks paid vacation. Plaintiff claims that at the time of his discharge he was entitled to five weeks paid vacation. Defendants argue that pursuant to the relevant portions of the National Master Freight Agreement plaintiff was not entitled to vacation benefits. Even assuming that plaintiff is entitled to such vacation pay, defendants contend that plaintiff failed to exhaust his available internal union remedies and this alone bars this cause of action.

█ Although not specified in the complaint, plaintiff's claim for five weeks vacation pay consists of "one week for 1984 and four weeks for 1985." Plaintiff's Statement of Material Facts ¶ 43, Document 70 of the Record. The Central Pennsylvania Supplemental Agreement to the National Master Freight Agreement (Agreement) establishes that plaintiff is entitled to receive four weeks paid vacation each vacation period. This same agreement also describes

a vacation period as "April 1 through March 31 of the following year." On the basis of the above, plaintiff's claim is apparently for one week paid vacation for the vacation period in which he was discharged and four weeks paid vacation for the ensuing vacation period.

Article 48, § 1(d) of the Agreement appears to control the issue of plaintiff's entitlement to vacation pay. This section, in pertinent part, states: "An employee who is discharged . . . shall not be paid vacation if the action of discharge . . . is prior to the employee's bid or assigned vacation period."

The record does not disclose the date on which plaintiff's next scheduled vacation week was to commence. However, according to the terms of the agreement, the plaintiff, as a discharged employee, would only qualify if his vacation period would commence no earlier than the date of his discharge. The court has reviewed the plethora of exhibits submitted for its review and is satisfied that this is not the case.

Plaintiff fails to state the basis upon which he is entitled to vacation benefits for the upcoming vacation period. The court has reviewed Article 48 of the Agreement which governs vacation pay. There is nothing in this article which would obligate Friedman's to pay plaintiff for his anticipated vacation.

█ Defendants have argued that on the basis of *Clayton v. International Union of Automobile, Aerospace and Agricultural Implement Workers of America*, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981) plaintiff was required to exhaust available internal union remedies before instituting suit against the Union and/or Friedman's. Union's Brief in Support of Motion for Summary Judgment, Document 26 of the Record at 20. It is undisputed that Pachick never submitted a grievance to the Union. Pachick Deposition at 81, 85–86, Document 50 of the Record. Plain-

---

**15.** Were the court to reach the merits of this claim, it would decide against the plaintiff. The mechanic was able to steer the truck after the accident, thus ruling out a steering defect. The evidence discloses that Ford Motor Company evaluated the spring and determined that both breaks occurred after the accident. Consequently, plaintiff's theory of mechanical defect fails.

tiff's brief argues that Belusko refused to accept a grievance on this issue. "Belusko informed Pachick that no grievance would be filed on his behalf and, if Pachick attempted to submit his own written grievance, Belusko would discard it." Plaintiff's Brief in Opposition to Motion for Summary Judgment, Document 42 of the Record at 24. Assuming that Belusko refused to accept the grievance, plaintiff's claim would still be barred because he failed to exhaust internal union remedies.

The Union contends, and plaintiff does not dispute, that the Executive Board of Local Union No. 401 has authority to overrule a decision made by Belusko not to process a grievance. *Id.* at 25, Union's Brief in Support of Motion for Summary Judgment, Document 26 of the Record at 19–20. Plaintiff's contention that Belusko refused to accept his grievance does not relieve him of the duty to appeal this alleged refusal to the Executive Board. *Id.*

### Plaintiff's State Law Tort Claims

█ The complaint sets forth causes of action based upon defamation, intentional interference with contractual relationships and prospective contractual relationships, and intentional infliction of emotional distress.

The court agrees with defendants' argument that these claims are merely recharacterizations of Pachick's federal claims and, as such, are preempted by federal labor law. All of plaintiff's state tort claims are based in the same acts and conduct which formed the basis for plaintiff's breach of fair representation and breach of contract claims and are thus preempted by federal labor law. *See Allis-Chalmers Corp. v. Lueck* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Carter v. Smith Food King*, 765 F.2d 916 (9th Cir. 1985); *Mitchell v. Pepsi-Cola Bottlers, Inc.*, 772 F.2d 342 (7th Cir.1985).

### The Labor-Management Reporting and Disclosure Act

█ Plaintiff's complaint alleges that his rights under the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 401 *et seq.* were violated.

The Union's Statement of Material Facts, ¶ 49, Document 26 of the Record, and its supporting brief, at 21, Document 26 of the Record, contend that there is no evidence to support an inference that plaintiff's guaranteed rights under the LMRDA were violated. The Union's contentions are supported by specific citations to the record.

Plaintiff's response to the Union's Statement of Material Facts argues that plaintiff was discharged because of his "outspokenness." Further, plaintiff argues that the Union failed to provide fair representation because of this outspokenness, ¶ 49, Document 70 of the Record. Plaintiff offers no support for this contention. Plaintiff's opposition brief devotes but one sentence to this issue and, again, offers no factual support. Plaintiff's Opposition Brief at 26, Document 42 of the Record.

Pachick admitted in a deposition that he freely attended union meetings on a regular basis and enjoyed freedom of speech within the union. Pachick Deposition at 88–90, Document 50 of the Record. The court has reviewed the record and has failed to discover any evidence which would support plaintiff's claim under the LMRDA. Consequently, summary judgment on this issue is proper.

### The Union's Motion to Strike

█ The complete procedural background to the Union's present motion to strike plaintiff's response to the Union's Statement of Material Facts is set forth in the court's Memorandum and Order filed on March 31, 1986, Document 62 of the Record.

The court's Memorandum and Order of March 31, 1986 was prompted by plaintiff's argument that a response to the defendants' Statement of Material Facts was not required because the allegations contained therein were previously denied by plaintiff in response to a Request for Admissions. The court rejected the argument for the following reasons.

The purpose underlying Local Rule 401.4 is to present a summary judgment motion to the court in an orderly and concise manner. Plaintiff cannot ignore the requirements of this rule by calling

the court's attention to responses to Requests of Admissions thereby expecting the court to search the record to determine if genuine factual disputes exist. Therefore, plaintiff will be ordered to respond to defendants' Statement of Material Facts by numbered paragraph and describing, with particularity, the factual predicate for the assertion that there is a genuine issue of fact.

*Id.* at 3–4.

On April 21, 1986, plaintiff filed a response to defendants' Statement of Material Facts to which there are no genuine disputes. Documents 69, 70 and 71 of the Record. Plaintiff's response to Friedman's Statement of Material Facts simply admitted or denied each allegation without explanation or reference to the record. The response to the Union's Statement of Material Facts is nearly barren of any specific citations to the record but does contain a specific statement of facts which purports to contradict each contested allegation.

Defendant Union contends that plaintiff's failure to support his denial by specific citation to the record is in contradiction to the court's Local Rules and a violation of the court's March 31, 1986, Order. Consequently, the union argues that its Statement of Material Facts must be deemed admitted. The court agrees with this reasoning and will grant the Union's Motion to Strike and deem both defendants' Statements of Material Facts admitted.

The March 31, 1986 Opinion required plaintiff to file an answer to the defendants' Statement of Material Facts in accordance with Local Rule 401.4. This rule states, in pertinent part: "The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried." The purpose of this Rule is to present the "summary judgment motion to the court in an orderly and concise manner." Document 62 of the Record at 3.

Plaintiff's present response to defendants' Statement of Material Facts does not present the issues to the court in an "orderly and concise" posture. As stated above, plaintiff responded to Friedman's Statement of Material Facts by merely admitting or denying the same. The basis of each denial is not presented for the court's consideration. *See* Documents 69 and 71 of the Record. Plaintiff's response to the Union's Statement of Material Facts does offer a factual foundation for each denial but neglects to support the denial with a reference to the record. In both instances, the court must still search through numerous depositions and over 100 exhibits to test the accuracy of each denial. This is precisely what Local Rule 401.4 is designed to prevent. Furthermore, the court's Order made clear that plaintiff was to state the "factual predicate for the assertion that there is a genuine issue as to material fact." Document 62 of the Record at 4.

The court rules that plaintiff's response to defendants' Statement of Material Facts violates the spirit of Local Rule 401.4 and directly contradicts the court's Memorandum and Order of March 31, 1986. A proper sanction is to deem both defendants' Statements of Material Facts admitted. Based on such admissions alone, summary judgment is proper.

Nevertheless, the court emphasizes that it has reviewed the exhibits, deposition testimony and the testimony before the Joint Hearing Committee. Many of the allegations contained in plaintiff's response to the Union's Statement of Material Facts have factual support in the record. However, the factual issues created do not preclude the entry of summary judgment in favor of defendants. Therefore, summary judgment is proper even if the court were to conclude that plaintiff had complied with Local Rule 401.4 and the court's March 31, 1986 Memorandum and Order.

An appropriate Order will enter.